## COLORADO SPRINGS CO. v. AMERICAN PUB. CO.

(Circuit Court of Appeals, Eighth Circuit.    October 30, 1899.)

### No. 1,210.

1. CORPORATIONS—VALIDITY OF TERRITORIAL INCORPORATION ACT—STATUTE OF COLORADO.

The amendment to the general incorporation act of the territory of Colorado adopted in 1870 (Sess. Laws 1870, p. 49), authorizing the organization of corporations "for the purpose of aiding, encouraging, and inducing immigration to this territory," and providing that such corporations should have power to purchase, hold, and sell lands, town lots, and other property, cannot be held invalid, as in excess of the powers conferred on

territories by congress, in view of Act June 10, 1872 (17 Stat. 390), in broad terms ratifying and confirming such territorial acts.

**2. SAME—POWERS—VALIDITY OF CONTRACTS.**

A corporation organized under such act, and authorized by its articles of incorporation to buy, hold, and sell lands, town lots, and mineral springs, to improve such property, build hotels and bath houses, and construct irrigation canals and ditches, had implied power to make contracts for printed matter or views of scenery calculated and intended to benefit the corporation by advertising the locality where its lands and springs are situated, and to induce immigration into the territory or state,—that being the principal purpose of the legislature in granting to corporations organized under the act such extensive powers; and it cannot repudiate contracts so made on the ground that for a number of years previously it had not exercised such power, so long as it retains and exercises the other powers conferred by its charter.

**3. SAME.**

A corporation making a contract which is within its charter powers for one purpose cannot avoid liability thereon on the ground that it was made for another and unauthorized purpose, unless it shows that the other party to the contract had knowledge of such fact.

**4. SAME—APPARENT AUTHORITY OF OFFICER.**

Where there was evidence that the person who was secretary and treasurer of a corporation, and one of its four directors, had been in charge of its office for a number of years, and had during such time transacted all its current business, making contracts and sales and leases of its lands, consulting the other directors only when he deemed it necessary, and being in fact the only person who represented the corporation in its dealings with third persons, such evidence justified the submission to the jury of the question whether he had been vested with such apparent authority that the corporation would be bound by a contract made by him in its behalf, and which was within its charter powers, although he did not possess such authority under the by-laws, or by virtue of his office.

**5. SAME—NOTICE OF OFFICER'S WANT OF AUTHORITY.**

A corporation in whose behalf a written contract has been executed by one of its officers, who had apparent, but not actual, authority to bind the corporation thereby, when sued on such contract, is entitled to show by parol that plaintiff's agent, who negotiated the contract, was notified by such officer that he had no authority to sign it in behalf of the company.

**6. SAME—IMPLIED POWER.**

To sustain an act done by a private corporation as a valid exercise of corporate power, it is only necessary, where the act is not challenged by the state, to show that the act in question was not prohibited by the company's charter, and that it had a natural and reasonable tendency to aid in the accomplishment of one or more of the objects for which the corporation was created.

**7. SAME—STOCKHOLDERS—CONTRACT—RATIFICATION.**

When, by statute, the power to transact the corporate business is vested in directors, stockholders can neither make nor ratify contracts for and in behalf of the corporation, unless such action is taken at a meeting where all of the stockholders are present or are represented.

In Error to the Circuit Court of the United States for the District of Colorado.

This action is founded upon three contracts between the American Publishing Company, the defendant in error, hereafter termed the "Publishing Company," and the Colorado Springs Company, the plaintiff in error, hereafter termed the "Springs Company." In the lower court the position of the parties was reversed, the suit having been brought by the Publishing Company as plaintiff against the Springs Company as defendant to recover damages for an alleged failure of the Springs Company to keep and perform the aforesaid contracts. The first of these contracts was in the form of a proposal, dated June 27, 1889, whereby the Publishing Company offered to furnish 20,000 copies

of a bird's-eye view of the city of Pueblo, "embodying your real-estate interests and the north side real estate prominently" at 25 cents apiece. The proposal was addressed to "George H. Parsons, Esq., Sec'y and Treas. Col. Springs, Colorado," and at the foot thereof was indorsed as follows: "Approved. Geo. H. Parsons." The second contract was likewise in the form of a proposal, dated June 28, 1889, whereby the Publishing Company proposed to finish a sketch and lithograph of "Pike's Peak Panorama, embodying such changes as suggested on sketch submitted to you," and to furnish 50,000 copies of said view on chromo plate paper, executed in first-class style, after proofs were submitted, at 75 cents apiece. By this proposal the Publishing Company also offered to send reliable canvassers to canvass for the Springs Company for the sale of the panorama, for which a commission was to be paid canvassers of 25 per cent. on all wholesale editions and 50 per cent. on all retail sales which might be made by canvassers in Colorado Springs, Manitou, Colorado City, and Denver. This proposal was addressed to "Geo. H. Parsons, Esq., Sec'y, Colorado Springs Co., Colo.," and was indorsed at the foot thereof as follows: "Approved, Geo. H. Parsons, Sec'y." The third contract was a formal agreement, dated March 7, 1890, whereby the Publishing Company on its part agreed to publish a souvenir for the World's Fair to be held in America in 1892 or 1893, containing the view of Pike's Peak Panorama in reduced form, in the same style as the large panoramic view, and to furnish the Springs Company an edition of 50.000 copies of said souvenir at least six months before the World's Fair was held at the price of $3.75 per copy. The Publishing Company also agreed to furnish to the Springs Company a large amount of stationery, consisting of letter heads, letters, note heads, bills, business cards, and envelopes, having engraved thereon a vignette of the "Pike's Peak Panorama." The contract price of the souvenirs, one-third of which was to be paid when proofs were submitted, was $187,500, and the contract price for the stationery and vignette was $6,150. The third contract was signed by George H. Parsons individually, and in behalf of the Springs Company as follows: "Colorado Springs Company, by Geo. H. Parsons." The complaint which was filed by the Publishing Company alleged a breach of the three contracts by the Springs Company, and claimed damages on account thereof in the sum of $171,915. The three contracts mentioned above were declared upon in three different counts. The jury found in favor of the Publishing Company on each of said counts, but no damages were assessed for the alleged breach of the first and second agreements, which were executed, respectively, on June 27 and June 28, 1889. Damages were awarded by the jury for the breach of the third agreement, dated March 7, 1890, in the sum of $32,525, for which amount a judgment was subsequently entered in favor of the Publishing Company. To reverse such judgment the record has been removed to this court by a writ of error.

John M. Waldron and John S. Macbeth, for plaintiff in error.

H. H. Lee and Theodore Kronshage, Jr. (W. H. Bryant, on the brief), for defendant in error.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

THAYER, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The first error assigned to which our attention is invited is the refusal of the trial court to give a peremptory instruction at the close of all the testimony, instructing the jury to return a verdict in favor of the Colorado Springs Company, which was the defendant below. It is argued at great length that this instruction should have been given—First, because the contracts sued upon were each and all beyond the corporate powers of the defendant company; and, second, if they were not in excess of its corporate powers, that the contracts were not executed in behalf of the defendant company by an officer or agent who was authorized to bind the company by

such agreements. These are the principal questions which the record presents for our consideration, and they will be first noticed.

The Colorado Springs Company was organized on June 26, 1871, under the laws of the then territory of Colorado. The general incorporation laws of the territory at that time provided (Rev. St. Colo. 1868, p. 117) that bodies corporate might be formed "for the purpose of carrying on any kind of manufacturing, mining, mechanical or chemical business, construct wagon roads, railroads, telegraph lines, dig ditches, build flumes, run tunnels, or carry on any branch of business designed to aid in the industrial or productive interests of the country"; and by an amendment to the general incorporation act, which was adopted in the year 1870 (Sess. Laws Colo. 1870, p. 49), it was provided, in substance, that, in addition to the companies which might be organized under existing laws, companies might also be formed "for the purpose of aiding, encouraging and inducing immigration to this territory," and that such companies, when organized according to the provisions of this act, "may purchase, acquire, hold, possess, sell, convey and dispose of lands, town lots and other property, whether real, personal or mixed." Under the warrant afforded by the general incorporation law of the territory as thus amended, the Colorado Springs Company, in its articles of association, declared that the objects for which the company was formed were "the purchase of lands and mineral springs in El Paso county and elsewhere in the said territory, and the establishment and building up of colonies, towns, and watering places in said county and elsewhere in said territory, and, in accomplishing these objects, to purchase, acquire, hold, possess, sell, convey, and dispose of lands, town lots, mineral springs, and other property; to prepare for sale and transport and sell the waters of said springs; and to erect hotels, baths, and make other improvements in connection therewith; and lease, sell, or otherwise dispose of the same; build ditches, wagon roads, and railroads, mills, and other manufacturing establishments, and work and operate or sell or lease the same; and especially to construct a dam and ditch for the purpose of conveying water to be used for manufacturing purposes and for irrigating the lands in and near the town of Colorado Springs, in said county of El Paso, which dam is to be built upon, and which ditch is to be taken out of Monument creek; * * * and generally to do all such things as are authorized by the acts aforesaid, which may tend to accomplish the said purpose." A doubt seems to have arisen prior to June 10, 1872, whether some of the then territories of the United States, including the territory of Colorado, which had passed laws authorizing the formation of corporations to engage in various kinds of business other than mining, manufacturing, and similar industrial pursuits, had not, by so doing, exceeded the authority conferred upon them by congress; whereupon, at the latter date, an act was passed (17 Stat. 390), which in broad terms ratified and confirmed all territorial laws theretofore enacted which authorized the formation of corporations for colonization purposes and the improvement of lands in connection therewith, or which authorized the formation of corporations for any rightful purpose con-

sistent with the constitution of the United States. It is apparent, therefore, that the general incorporation law of the territory of Colorado, as amended by the act of 1870, under which the Springs Company was organized, cannot be successfully challenged at this time on the ground that those acts were in excess of the power that had been conferred on the territorial government by the national legislature. A suggestion of that kind is made by counsel for the defendant company, but it is obvious, we think, that the suggestion is without merit.

Counsel for the defendant company also argues—and we are disposed to concede—that the legislature of the territory of Colorado did not intend that any one corporation which might be formed under the general incorporation law should engage in all of the various kinds of business enumerated in that act. Notwithstanding this concession, it is clear, however, that the territorial legislature did intend that corporations might be formed to encourage and induce immigration, and that in aid of that object corporations of that class should be vested with the power to acquire, hold, and dispose of lands, town lots, and other property, both real, personal, or mixed. Under the broad grant of authority conferred by the amendatory act of 1870, above cited, it is apparent, we think, that a corporation organized thereunder could lawfully open mineral springs on its lands, and take the necessary steps to found watering places thereon by advertising the medicinal virtues of the waters found in such springs, the healthfulness of the climate, and the grandeur of the surrounding scenery. Such a corporation could also acquire a body of land, and divide it into town lots, for the establishment of villages or cities, or sell the same in larger tracts for colonization or agricultural purposes. All of these powers, if exercised, would have a natural tendency to induce immigration to the territory, and increase its resources, which was the main object that the legislature appears to have had in view in conferring such extensive power to acquire and hold land. We perceive no reason, therefore, why a corporation which was organized, as the defendant company appears to have been, for the professed purpose of building up colonies, towns, and watering places in the territory of Colorado, and of acquiring land in aid of that object, should be restricted in the exercise of its powers, as its counsel seek to restrict it, to the exercise of the single power to purchase, sell, and lease lands situated within the county of El Paso. It is obvious, from an inspection of the defendant's articles of association, that the persons who organized the company intended that it should exercise other and more important functions, and of its right to exercise other powers besides the power to purchase and sell land in a single county we can entertain no doubt, in view of the liberal provisions of the act under which it was incorporated. The power which was conferred upon it by the general incorporation law to acquire, hold, and dispose of real estate and other property, was not given to it solely for its own profit, but to enable the corporation to aid in the development of the territory by promoting immigration. The service which the defendant company was expected to render to the public at large by encouraging immigration, and thereby increasing the wealth

and resources of the territory, was the main consideration for conferring upon it its extensive power to deal in real estate, and for that reason it ought not to be permitted to abandon the exercise of the former function, no matter what may have been its practice in recent years. It acquired a power which was practically unlimited to purchase and hold land at any place within the territory on the pretense that it would found colonies, build up towns and watering places,—or, in other words, that it would encourage persons to take up their abode in the territory; and it cannot be heard to say that it has lost that power because in recent years it has confined its operations to the sale and leasing of lots in a few cities and villages in El Paso county. The evidence contained in the record is not sufficient to satisfy us that the operations of the defendant company for many years past have not been different or more extensive, as it is claimed, than those of an ordinary private landowner; but, even if that fact was sufficiently shown, we should nevertheless be constrained to hold that its chief corporate function is the encouragement of immigration, and that it still possesses the charter power to induce people by any lawful means to become permanent or temporary residents of the state of Colorado, and particularly of those localities where most of its lands are situated, and where it has large financial interests.

It results from the foregoing considerations that the contracts in suit cannot be declared void on the ground that they are in excess of the corporate powers of the defendant company. The contracts in question, with the exception of the first (as to which there was no recovery), related to a panoramic view of Pike's Peak and its immediate vicinity, including therein the towns of Manitou, Colorado City, and Colorado Springs, in all of which the defendant appears to have had large interests. This panoramic view, on a reduced scale, was to be inserted in a pamphlet known as the "World's Fair Souvenir," which contained sketches of several other notable places in various parts of the country, and it was also to be engraved on a large amount of stationery, which the defendant had an undoubted right to purchase. It is obvious that the large panoramic view to which the second contract related and the World's Fair Souvenir were intended for very general circulation throughout the United States, especially during the season of the Columbian Exposition, and it was doubtless supposed that by reason of their extensive circulation during that year, and the notable character of the scenery which was represented, they would attract visitors to Pike's Peak and the watering places adjacent thereto, and prove to be an effective and valuable means of advertising the defendant's lands and increasing its patronage. By entering into the contracts, therefore, the defendant simply embarked in an advertising venture, which involved a large outlay, but it was doubtless supposed that it would be reimbursed in a great measure for its expenditures by the sale of the souvenirs and copies of the large panoramic view, which were to be executed in first-class style, and to possess considerable artistic merit. Moreover, the method of advertising which it saw fit to adopt to induce an influx of visitors and a probable increase of its patronage was not an unusual one

considering the fact that it was a large landowner, having extensive interests in the towns adjacent to Pike's Peak, and that one of its chief functions was the encouragement of immigration. We are of opinion, therefore, that the contracts in suit were within the implied powers of the defendant company. It was strictly a private business corporation, having no public duties to perform other than the encouragement of immigration. The question concerning its power to execute the contracts is not raised by the state, but by the corporation itself, to avoid a liability to another corporation with which it has contracted; and for these reasons a more liberal view may be taken of its implied powers than could otherwise be entertained. To sustain these contracts as a valid exercise of corporate power, it is only essential that it should appear that the acts undertaken by the defendant company were not expressly prohibited by any provision of its charter, and that they had a natural and reasonable tendency to aid in the accomplishment of the objects for which the corporation was created. Chicago, R. I. & P. Ry. Co. v. Union Pac. Ry. Co. (C. C.) 47 Fed. 15, 22; Omaha Bridge Cases, 10 U. S. App. 98, 51 Fed. 309, 2 C. C. A. 174; Tod v. Land Co. (C. C.) 57 Fed. 47, 53; Thomp. Corp. § 5641, and cases there cited; Cook, Stock, Stockh. & Corp. Law, § 681. That they did have such a tendency we can entertain no reasonable doubt on the state of facts disclosed by the present record.

Counsel for the defendant company furthermore contend that the contracts in suit were ultra vires, and for that reason unenforceable, provided they were entered into not as a means of advertising the defendant's business and encouraging immigration, but merely as a speculative enterprise for the purpose of earning a profit by the sale of the souvenirs and panoramic views for a sum in excess of the cost of their production and sale. We are willing to concede this proposition, with the qualification, however, that the defendant cannot avoid liability on this ground unless it is shown that the other contracting party, to wit, the American Publishing Company, was advised of the motive which actuated the defendant when the contracts were executed. Having the charter power to enter into the agreements for a certain purpose, it cannot now avoid liability to the other contracting party by asserting that it entered into the agreements for another and unauthorized purpose, unless it proves—and the burden is on it to prove—that the Publishing Company was made acquainted with the object for which the souvenirs and the views were purchased. The lower court was not asked by the defendant to submit this issue to the jury, and for that reason it is not entitled to complain on the present occasion because it was not submitted or because this issue of fact was ignored.

We pass, in the next place, to the consideration of the question whether there was any substantial evidence tending to show that George H. Parsons, by whom the contracts in suit were executed, possessed the requisite power to bind the corporation. If there was substantial testimony tending to sustain the affirmative of this issue, then, as a matter of course, the case was properly submitted to the jury. In the consideration of the latter question it may be conceded at the outset that Parsons did not possess the power in question under

97 F.—54

any of the provisions of the by-laws of the defendant company, or by virtue of his office.   Such power as he possessed to execute the contracts had been acquired, if at all, by the conduct of the corporation in holding him out to the public for many years as its general manager or agent, and in permitting him in this way to acquire an apparent authority which was calculated to deceive persons with whom it had business intercourse or dealings.   The evidence that was adduced on this head, without going too much into detail, may be summarized as follows:   For about 15 years before the contracts in question were signed Parsons had been a trusted officer of the defendant company, occupying the position of its secretary and treasurer.   During most of that period he had transacted all of its current business, had charge of its office, and had his name prominently displayed on the letter heads and the bill heads of the company as its secretary and treasurer.   The company had only four active directors, including Parsons, and two of these were frequently absent from Colorado Springs, where its chief office was located, for several weeks or months at a time.   The fourth active director gave but little attention to the business of the corporation, intrusting it chiefly to Parsons. Meetings of the board of directors were held at long and irregular intervals, and on some occasions such meetings could not have been held, for want of a quorum, if a meeting had been desired, because some of the directors were abroad, and others absent from the state. Parsons repeatedly negotiated agreements for the sale and leasing of lands.   He negotiated on one occasion a sale of an important right of way through the company's property, and on another occasion he modified, on his own responsibility, a contract for the sale of a considerable tract of suburban land that had been sold previously.   He also borrowed money for the company on some occasions, and hypothecated some of its securities to secure its repayment.   On some occasions he voted stock which the defendant owned in other corporations, and he always attended on behalf of the company to fixing the value of its property for the purpose of taxation.   He ordered and paid for a few advertisements at different times, but none of them involved any considerable expenditure of the company's funds.   He was practically the only officer with whom people came in contact when they had business with the company, and he had transacted its business so generally, and for so many years, that persons who had frequent dealings with the company had come to regard him as its general manager.   The plaintiff company also offered testimony which tended to show that the negotiations concerning the contracts now in controversy were not conducted solely by Parsons, but that on one or two occasions when the subject was under discussion William A. Bell, the vice president of the company, and one of its active directors, was also present, and inspected the proofs of the proposed Pike's Peak Panorama when the same were submitted for approval, and suggested some changes therein, which were subsequently made.   It was also proven that the three contracts in suit were copied into the record book of the defendant company shortly after they were executed, and that they had remained of record in the books of the company from that time forward until the present action

was instituted. The most important evidence, however, concerning the extent of Parsons' authority was that given by William J. Palmer, the president of the defendant company, on his cross-examination. As we read the examination of this witness, he conceded, in substance, that Parsons had transacted the great mass of the company's business for as much as eight or ten years without consulting any one unless he thought proper to do so; that he was not required to consult any one, or at least that he did not do so, unless he (Parsons) deemed the matter of sufficient importance to require some advice; that it was his province, or at least his custom, to determine that question for himself; and that he pursued this policy of making contracts in behalf of the company, without any restraint upon his actions except the fear that he might possibly lose his position if his conduct on any occasion proved to be unsatisfactory. As none of the agreements that were made by Parsons during the period in question appear to have been repudiated until the present controversy arose, it is by no means strange that the impression gradually gained ground in the locality where the company transacted its business that Parsons was its general agent, and that all contracts made by him which were within the scope of the company's charter powers would be recognized by it as obligatory. In view of the testimony to which we have adverted, we are of opinion that the trial court was fully justified in allowing the jury to determine whether the defendant company, by its course of dealing, had not armed its secretary and treasurer with a power to execute the contracts in suit which it could not deny, and that it would have erred if it had withdrawn that issue from the consideration of the jury. Counsel for the defendant company suggest that because Parsons had never before executed a contract like the contracts now in hand, or a contract of their importance and magnitude, therefore the testimony which was adduced was insufficient to support a finding that they were executed in pursuance of lawful authority or in pursuance of an apparent authority which the defendant was estopped from denying. We think, however, that it was not essential to the submission of the case to the jury that the plaintiff company should have shown that Parsons had theretofore executed contracts of a precisely similar nature involving an expenditure of the same amount of money, which the company had afterwards executed or approved. It was sufficient, in our judgment, that there was evidence which tended to show that the defendant had for a period of years left him at full liberty to make any contract within the purview of the corporate powers which he deemed expedient, without consulting the board of directors unless he elected to do so. If he was vested with an authority of that nature, it was fully adequate to sustain the contracts in controversy.

It is next assigned for error that the trial court wrongfully excluded certain testimony that had an important bearing on the question whether the contracts were executed in pursuance of an authority which the defendant was not entitled to dispute. We have been forced to conclude that this assignment is well founded. The defendant had in its employ from June 15, 1888, to November 20, 1895, a clerk by the name of Shoup, who was called as

a witness in its favor. He stated that he was present in the company's office when the last of the three contracts, being the one dated March 7, 1890, was executed. He was asked, in the course of his examination, to state all that occurred between Parsons and the agent of the American Publishing Company when that contract was negotiated and executed. The trial court refused to permit this question to be answered, whereupon the defendant's attorney offered to show by the witness that he heard the entire conversation between Parsons and the plaintiff's soliciting agent at the time the contract was entered into; that the conversation was to the effect that the contract was a personal matter between Parsons and the Publishing Company; that the name of the defendant company was not mentioned till the agreement was fully prepared by the plaintiff's agent, and ready for signatures; that Parsons objected to signing the defendant's name to the contract, assuring the agent that he had no authority to do so; that thereupon the plaintiff's agent stated, in substance, that he did not intend to make the defendant company a party to the agreement, but desired that Parsons should sign the agreement as an officer of the Colorado Springs Company, to show that he was a person of position and influence, and that on the strength of that assurance Parsons finally signed it in the form heretofore shown. At the time the trial took place Parsons was dead, but the plaintiff's agent, by whom the contract was negotiated, was living, and was a witness at the trial. Counsel for the plaintiff below make light of this offer of proof, and suggest that its admission would have violated the rule that oral testimony of what transpires when an agreement is signed cannot be permitted to vary its terms or legal effect. We are not able, however, to accept that suggestion as a sufficient reason for rejecting the proffered testimony. Parsons had no power, as we have before conceded, to sign the contracts in suit,—particularly the last contract,—either under the by-laws of the company or by virtue of his office. The company can only be held bound by his acts in signing the agreements on the ground that by a long course of dealing it had armed him with a power which it ought not to be permitted to dispute in a controversy with a third person, who dealt with him in good faith on the strength of his apparent power. One who deals with an agent who seems to have the requisite authority to bind his principal, but who is advised at the time, either by the agent himself or by any one else, that in point of fact he has no right to act in the matter in hand without consulting his principal, cannot invoke the doctrine of estoppel to sustain a contract with the agent which was made under such circumstances. When one who is dealing with an agent is advised by any responsible person having authority to interfere in the transaction that the agent's apparent power is not real, he is put on his guard, and acts thereafter at his peril, if he fails to consult the principal. The contracts in suit involved an expenditure of a large sum of money; and for the protection of his own principal, as well as for the protection of the defendant company, the plaintiff's agent should have heeded the statement of Parsons that he was exceeding his power by signing the agreement, if

such statement was in fact made. We are of opinion, therefore, that the evidence in question was material and important testimony, which the trial court should have admitted, leaving the jury to determine what weight they would attach to it. It may be that the admission of the proof would have changed the result of the trial.

As the case must be sent back for a new trial, it will be unnecessary to notice in detail all of the exceptions which were taken to the charge. In the main the objections that are made to the instructions seem to be that they dealt too largely in abstract propositions of law, which, although correct in themselves, were not adapted to the case, and for that reason had a tendency to mislead the jury. Some of the criticisms of the instructions on this ground may be justifiable, but we are not prepared to hold that they are of sufficient importance, in themselves, to warrant a reversal of the judgment. In one of the instructions, however, the trial court advised the jury, in substance, that a resolution which was passed at a stockholders' meeting held in June, 1891, and had been read in evidence, amounted to an express ratification of the contracts in suit if the stockholders present at that meeting had knowledge at the time of the existence of the contracts. This instruction is challenged on the ground that, as the power to make contracts was vested solely in the directors, and not in the stockholders, the latter had no power to ratify the contracts in suit, because they were without power to enter into the contracts originally. The statutes of the state of Colorado provide, in substance (Mills' Ann. St. §§ 481, 483), that the powers of a corporation shall be exercised by a board of directors or trustees of not less than three nor more than thirteen, who shall be elected annually by the stockholders, and who shall be empowered to elect one of their number president, and such subordinate officers as the company may by its by-laws designate. Where, by statute, the power to transact the corporate business is thus lodged in the directors, it seems to be well established that the stockholders cannot enter into contracts either individually or while acting together at stockholders' meetings, unless, indeed, all of the stockholders are in attendance at such meetings. Union Gold-Min. Co. v. Rocky Mountain Nat. Bank, 2 Colo. 565, 575; Gashwiler v. Willis, 33 Cal. 12, 20; Thomp. Corp. § 3975; Cook, Stock, Stockh. & Corp. Law, §§ 708, 709, and cases there cited. And where stockholders are denied the power to make contracts on the part of the corporation, either while acting singly or collectively at a stockholders' meeting, it follows that they have no power to ratify contracts that have been made by an agent of the corporation unless every stockholder is present or is represented when the ratification takes place. Mechem, Ag. § 111. For these reasons we are of opinion that the instruction above referred to, which gave to the resolution of a stockholders' meeting the effect of a ratification, was erroneous, inasmuch as it did not appear that at the meeting of the stockholders by which the resolution was adopted the entire stock of the company was then and there represented. This resolution, when it was offered and read in evidence, was not objected to on the ground that the stock-

holders were without power at a stockholders' meeting to ratify the contracts, but it was objected to solely on the ground that the stockholders were not at that time aware of the existence of the contracts. The admission of the resolution in evidence is not claimed to have been erroneous on any other ground except the one last mentioned, and, in any event, it was probably admissible in evidence as having some tendency to show that the stockholders had examined all of the proceedings of the board of trustees and of the officers of the company since their last meeting, which they professed to ratify, and in that way had become acquainted with the existence of the contracts in suit, which were incorporated in its records, and that they had no objection thereto. For the reasons heretofore indicated, the judgment below must be reversed, and the cause remanded for a new trial. It is so ordered.