## THRAILKILL v. CROSBYTON–SOUTHPLAINS R. CO. et al.

(Circuit Court of Appeals, Eighth Circuit. October 15, 1917. Rehearing Denied January 16, 1918.)

### No. 4649.

1. BROKERS ⬤⟿40—COMPENSATION.
    Defendant, which owned a large tract of land, placed it in the hands of a corporation as its agent for sale, on terms therein agreed upon. Afterward plaintiff sold certain of the lands under a contract with a third party, which was interested, to pay a commission on such sales. *Held*, that there was no implied contract by defendant to pay such commissions, but that, at least in the absence of evidence to the contrary, it had the right to suppose that plaintiff was acting for and paid by its agent.

2. CORPORATIONS ⬤⟿452—CONTRACTS—FORMAL REQUISITES.
    Where an agent of a railroad company had authority to execute a contract in its behalf, the fact that he signed it as "Land Commissioner," instead of "Special Emigration Agent," which was his official designation, was immaterial, and does not relieve the company from liability thereon.

3. CORPORATIONS ⬤⟿385—CORPORATE POWERS—DOCTRINE OF ULTRA VIRES.
    The doctrine of ultra vires, whether invoked for or against a corporation, is not favored in the law.

4. CORPORATIONS ⬤⟿456—IMPLIED POWERS—RAILROAD COMPANIES.
    It is within the implied powers of railroad company, whose line runs through a territory largely unsettled, as an aid to its own business to encourage settlement of lands tributary to its road, and to that end it may make a valid contract to pay a reasonable commission on sales of such lands to settlers, although it is not the owner of the same.

    Hook, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Southern District of Iowa; Martin J. Wade, Judge.

Action at law by Della Thrailkill against the Crosbyton-Southplains Railroad Company and the C. B. Live Stock Company. Judgment for defendants, and plaintiff brings error. Affirmed as to the Live Stock Company, and reversed as to the Railroad Company.

Earl R. Ferguson, of Shenandoah, Iowa (C. R. Barnes, of Shenandoah, Iowa, on the brief), for plaintiff in error.

J. W. Burton, of Crosbyton, Tex. (D. W. Higbee, of Creston, Iowa, on the brief), for defendants in error.

Before HOOK, SMITH, and CARLAND, Circuit Judges.

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

SMITH, Circuit Judge. In July, 1900, there was organized under the laws of Illinois the defendant the C. B. Live Stock Company, with its principal place of business at Chicago, Ill.  It originally had a capital stock of $100,000, divided into shares of $100 each, held as follows:

| | | |
|---|---|---|
| Julian M. Bassett. .. | 200 shares | $20,000.00 |
| L. A. Coonley, ward | 150 shares | 15,000.00 |
| Howard Coonley | 75 shares | 7,500.00 |
| Avery Coonley | 200 shares | 20,000.00 |
| Edward P. Bailey. | 100 shares | 10,000.00 |
| John Stuart Coonley | 200 shares | 20,000.00 |
| Sarah Coonley | 75 shares | 7,500.00 |

This company had acquired by 1912 about 87,000 acres of land in Crosby county, Tex.  In the meantime railroads had been built through the region, but none striking the lands of the defendant the C. B. Live Stock Company.  It was about 40 miles to the nearest point on the railroad.  Then the owners of the C. B. Live Stock Company decided to build a railroad.  An Illinois corporation, and least of all one organized to engage in the live stock business, could not build a railroad in Texas, and it was decided to organize a new corporation for that purpose.  It was necessary for a majority of the directors of the railroad company to reside in Texas, and for the reasons stated and to get more capital five or six new stockholders were taken into the new company, not in the old.  On March 28, 1910, the articles of incorporation of the Crosbyton-Southplains Railroad Company were acknowledged, and on April 2, 1910, the majority of the board of directors made affidavit that the capital stock had been subscribed to an amount in excess of $1,000 per mile of the proposed railroad and 5 per cent. thereof had been paid in cash.  On April 6, 1910, the Attorney General certified that the articles were in accordance with the provisions of chapter 1, title 94, of the Revised Statutes of Texas, and not in conflict with the laws of the United States or the state of Texas. On the same day the articles were filed for record with the secretary of state and recorded.  On May 10, 1911, the first train was operated over the road which extended from Spur, in Dickens county, across Crosby county, to Lubbock, in Lubbock county, and it has been continuously operated ever since.  On May 9, 1912, the C. B. Live Stock Company entered into a contract with the Realty Realization Company of Chicago, Ill., by which the former put all its lands in the hands of the latter company for sale, agreeing to pay $5 per acre for the expense of sale, and 30 per cent. of the purchase money above a stipulated net price as a commission for making the sale.  The Crosbyton-Southplains Townsite Company and the Realty Realization Company entered into a contract, adopting the contract between the C. B. Live Stock Company and the Realty Company, save a change as to the amount of the commission on the sale of town lots.  On the same day, but whether before or after the two contracts just referred to, does not appear, and perhaps that is immaterial, at a special meeting of the board of directors of the Crosbyton-Southplains Railroad Company:

"The chairman stated to the board that, on account of the vast unsettled country through which the road is operating and will operate if extended, it

had become necessary to establish an emigration department in order to get into communication with settlers, emigration companies, agents, and land-owners, and to assist in advertising and settling farmers and others in Crosby and adjoining counties. He stated that, as the company had for its object the transportation of freight and passengers, it was incumbent upon the board to do all in its power to help create this business in every legitimate manner, and that he believed that an emigration department would greatly increase traffic of all kinds of the railroad, by aiding in settling the country and creating a publicity department, such as is usual with the present-day railroad. Whereupon, on motion duly made and seconded, the board did unanimously create and establish, for this company and for the purposes mentioned by the chairman, an emigration department, and appointed Clinton S. Woolfolk general emigration agent, and did authorize the vice president-general manager to pay said general emigration agent whatever salary deemed necessary by said vice president-general manager; said general emigration agent to work under the authority of the vice president-general manager, with power to appoint special emigration agents, under the advice and with the consent of the vice president-general manager."

The salary of Clinton S. Woolfolk as "general emigration agent" was subsequently fixed at $1 a month and an annual pass on the railroad. Numerous persons were appointed special emigration agents, as provided for in the action of the board of directors. Among these was George W. Butler, W. J. Brunson, F. W. Wilsey, and probably Fred H. Johns. Their salary was also fixed at $1 a month and a pass over the road. On August 24, 1912, a contract was entered into, signed by the "Land and Colonization Department, Crosbyton-Southplains Railroad Company, by George W. Butler, Land Commissioner," and the plaintiff, Della Thrailkill. This contract recited that the railroad controlled the sale of certain lands in Crosby and Dickens counties, Tex., and desired to secure the services of Mrs. Thrailkill in the sale and disposition of the same, and appointed and designated her as agent at Clarinda, Iowa, for the sale of said lands.

"The party of the first part [the Railroad Company] agrees to pay to the party of the second part [Mrs. Thrailkill] as compensation for services in the premises a commission equaling $3 per acre up to $40 per acre and 7½ per cent. on land above $40 of the purchase price at which any lands are sold by or through the efforts of such second party at prices and terms acceptable to said first party."

There is no evidence that this contract was ever terminated, but on August 24, 1913, a new and similar contract was executed in the name of the Orchards Heights Development Company, the Crosbyton-Southplains Railroad Company, by Fred H. Johns, manager, and by Mrs. Thrailkill. The plaintiff went ahead and sold considerable quantities of the lands of the C. B. Live Stock Company under these contracts, and brought suit against it and the Railroad Company to recover for the stipulated commissions. The case was tried to a jury, and at the conclusion of all the evidence the court said:

"In the cause on trial  *  *  *  there has been submitted to the court in the course of the evening a motion to direct this jury to return a verdict for the defendants, and that has been fully argued by counsel on both sides, and on the submission of the motion I have deemed it my duty to instruct you to return a verdict for both defendants in this case for two reasons, along with other reasons: First, that the Railroad Company—that as to any contract or obligation of the Railroad Company—made to take care of commission of

agents working for the Realization Company, that the Railroad Company has no power to make such a contract, being a public service corporation, the rates being fixed by the law, by the Interstate Commerce Commission. It has no money except what people pay for transporting goods over the railroad. It has only power to use money for legitimate railroad purposes, and not for speculation of this kind, and any contract made would be absolutely void, if a contract was made. As to the Cattle Company, I should say that the evidence here is that the Realization Company did sell this land for them, and that she, the plaintiff, was working for the Realization Company, and of course the Live Stock Company would not be held to pay the agents—the men employed to sell the land under a contract by which that agent, the Realization Company, agreed it would pay all the expense itself, any more than if [you] hired a man to sell your farm for you, and agreed to pay him $200, and he went out and hired another man, and agreed to give him $50; you would not be bound to pay the $50 and also the $200. So for those two reasons the motion is sustained. You are directed to return a verdict for the defendants, and you may sign this."

To this instruction the plaintiff excepted, and, after judgment rendered upon a verdict returned in accordance with the instruction, the plaintiff sued out this writ of error.

[1] Let us first see if the ruling of the District Court is correct as to the C. B. Live Stock Company. There is no claim there is any express contract between plaintiff and it. Reliance is had as against that corporation upon the right to recover under a quantum meruit. When, as in this case, the C. B. Live Stock Company had a contract with the Realty Realization Company to sell its lands, and there is nothing to indicate that it knew that the plaintiff was selling the lands in their own behalf, or not as a subagent of the Realty Realization Company, there is nothing upon which an implied contract of the C. B. Live Stock Company to pay her can rest. The court was right in directing a verdict for the C. B. Live Stock Company. Very different is the situation with reference to the Crosbyton-Southplains Railroad Company.

With that corporation the plaintiff had what appeared to be an express written contract to pay her $3 per acre commission upon all lands controlled by them sold by her. Two questions naturally arise: First, did the agent who signed her contract have authority to do so? Second, was said contract ultra vires?

[2] The first contract in the name of the Railroad Company was signed "The Land and Colonization Department, Crosbyton-Southplains Railroad Company, by George W. Butler, Land Commissioner." This was manifestly signed by the Railroad Company, by Butler, and, if he had authority to make the contract, the mere fact that he signed it "Land Commissioner," in place of "Special Emigration Agent," would not defeat a recovery. It is evident that the contract was signed by the company by Butler, and if Butler had authority to sign the contract for the corporation it could make no difference if he signed it "Land Commissioner," in place of "Special Emigration Agent."

We therefore turn to the question whether he had the power as special emigration agent to sign the contract. The chairman of the board of directors told the board that on account of the vast unsettled country through which the railroad was operating it became necessary to establish an emigration department in order to get into communi-

cation with settlers, emigration companies, agents, and landowners, and to assist in advertising and settling farmers and others in Crosby and adjoining counties. It was accordingly unanimously resolved to establish for the purposes mentioned by the chairman an emigration department and Clinton S. Woolfolk was appointed general emigration agent, with power to appoint special emigration agents upon the advice and with the approval of the vice president-general manager. Under the resolution Butler was appointed special emigration agent, and as such, under the title of "Land Commissioner," he signed the contract. The words "Land Commissioner" are descriptio personæ, and the contract, if signed in the name of the Crosbyton-Southplains Railroad Company, by George W. Butler, without more, would be sufficient, if it appeared that George W. Butler was an agent of the Crosbyton-Southplains Railroad Company authorized to make the contract. The creation of the emigration department, to get into communication with settlers and to assist in settling farmers and others in Crosby and adjoining counties, and the appointment of Mr. Butler as special emigration agent, apparently vested in him the authority to make the contract in question.

[3] We come now to the question as to whether said contract was ultra vires. There is no express prohibition of such a contract by a railroad company in the laws of Texas. It is customary for railroad companies for the purpose of developing freight and passenger business to maintain immigration departments. No authority has been called to our attention which prohibits such departments or the paying of reasonable compensation for securing settlers. The doctrine of ultra vires, whether invoked for or against a corporation, is not favored in the law. San Antonio v. Mehaffy, 96 U. S. 312, 315, 24 L. Ed. 816; Railway Co. v. McCarthy, 96 U. S. 258, 267, 24 L. Ed. 693; St. Avit v. Kettle River Co., 133 C. C. A. 76, 216 Fed. 872.

[4] Could the Railroad Company lawfully contract to pay commissions upon the sale of lands which it did not own, but along its route, by individuals to other individuals; the Railroad Company being neither vendor nor vendee?

It seems to us that this is a question as to whether the Railroad Company has a right to advertise the lands along its route to bring settlers, and, if it can, why can it not pay a reasonable sum to some one to secure purchasers rather than to expend a large sum in advertising in the hope of securing purchasers? The question must ordinarily be resolved into one of whether the contract is fair and reasonable. In Heinz v. National Bank of Commerce, 150 C. C. A. 592, 237 Fed. 942, this court said:

"It is elementary that the corporate powers of a national bank, as well as of other corporations, are of two classes: (1) Those expressly granted; and (2) those impliedly granted, as reasonably incident and necessary to the carrying out of the powers expressly granted. The former have to do largely with the main business objects and purpose of the corporation; the latter largely with the means and methods of attaining those objects and carrying out those purposes. The former are determined once and for all by the language of the charter or the fundamental law; the latter may change according to time, place, and surrounding circumstances. The test of the former is whether they are found in the words of the charter or law; the test of the

latter is whether they are fairly incident to the former, and reasonably necessary to carrying them out. In determining whether a given act is within the former, the judgment, and actions of the directors and stockholders have no legal weight or bearing. In determining whether a given act is within the latter, the judgment of the directors and stockholders, while not conclusive, is entitled to consideration. Morse on Banks and Banking, § 54; Machen, Modern Law of Corporations, vol. 1, §§ 68, 87–90; Thompson on Corporations (2d Ed.) §§ 2100–2129. In Burnes v. Burnes, 137 Fed. 781, 70 C. C. A. 357, this court said, speaking of the implied powers of a private corporation; 'While the powers of a corporation are limited to those expressly granted and those fairly incidental thereto, they include the latter as completely as the former, and they always include the indispensable and the suitable means to exercise the granted powers.' In Colorado Springs Co. v. American Publishing Co., 97 Fed. 843, 38 C. C. A. 433, this court said, in speaking of the same subject: 'To sustain an act done by a private corporation as a valid exercise of corporate power, it is only necessary, where the act is not challenged by the state, to show that the act in question was not prohibited by the company's charter, and that it had a natural and reasonable tendency to aid in the accomplishment of one or more of the objects for which the corporation was created.' That the word 'necessary,' when used in reference to implied powers, does not mean indispensable, and is not to be given a narrow, restricted meaning, it is only necessary to refer to McCulloch v. Maryland, 4 Wheat. 316, 413, 414, 4 L. Ed. 579."

In Jacksonville, etc., Railway Co. v. Hooper, 160 U. S. 514, 16 Sup. Ct. 379, 40 L. Ed. 515, the court quotes with approval the language of Lord Chancellor Selborne in Attorney General v. Great Eastern Railway, 5 App. Cas. 473, 478:

"This doctrine ought to be reasonably, and not unreasonably, understood and applied, and that whatever may fairly be regarded as incidental to, or consequential upon, those things which the Legislature has authorized, ought not, unless expressly prohibited, to be held, by judicial construction, to be ultra vires."

In Union Pacific Ry. Co. v. Chicago, etc., Ry. Co., 163 U. S. 564, 581, 16 Sup. Ct. 1173, 1180 (41 L. Ed. 265), the court said:

"But where the subject-matter of the contract is not foreign to the purposes for which the corporation is created, a contract embracing 'whatever may fairly be regarded as incidental to, or consequential upon, those things which the Legislature has authorized, ought not, unless expressly prohibited to be held by judicial construction to be ultra vires.'"

A railroad company may enter into contracts not expressly nominated in its charter, if they are reasonably incidental to its objects or subsidiary to its chief purposes. Whatever transactions are fairly incidental or auxiliary to the main business of the corporation and necessary or expedient in the protection, care, and management of its property may be undertaken by the corporation and be within the scope of its corporate powers. Teele v. Rockport Granite Co., 224 Mass. 20, 112 N. E. 497.

The Railroad Company ran for many miles through the lands of the C. B. Live Stock Company. It could obtain no business, freight or passenger, through that territory, except as it derived it directly or indirectly from the Live Stock Company. It was deeply interested from every financial point in having these lands divided up. The commissions agreed to be paid were, as shown by the evidence, very low for that region. We are of the opinion that, to secure the di-

viding up of these lands, one of the incidental powers of the Railroad Company was to agree to pay reasonable commissions for the sale of these lands, and the contract made in the name of the company by Butler was not ultra vires.

It is true the District Court treated this as a contract to take care of commissions of agents working for the Realty Realization Company. This contract did not so provide. There is no evidence that the plaintiff was in these matters the agent of the Realty Realization Company.

Our conclusion is that the judgment must be affirmed as to the C. B. Live Stock Company and reversed as to the Crosbyton-Southplains Railroad Company, with directions to set aside the verdict as to that corporation and grant a new trial.

HOOK, Circuit Judge, dissents.