BURNES et al. v. BURNES et al.

(Circuit Court of Appeals, Eighth Circuit. May 1, 1905.)

No. 2,137.

1. ESTATES OF DECEASED PERSONS—DISTRIBUTION OF PERSONALTY BEFORE ORDER OF DISTRIBUTION.

The conveyance by administrators to distributees of their respective shares of the personal property of an estate, which is not previously authorized, but which is subsequently approved by the probate court, devests the administrators of all title and interest therein, and vests it in the distributees as of the date of the conveyance.

2. CORPORATIONS—POWER TO PURCHASE THEIR OWN STOCK.

In the absence of constitutional or statutory prohibition, corporations have the inherent power to buy, to retire, and to sell their own stock.

[Ed. Note.—For cases in point, see vol. 12, Cent. Dig. Corporations, § 1530.]

3. SAME—PAYMENT IN ANNUITIES.

A corporation which is not organized to grant, purchase, or dispose of annuities may legally contract to pay in annual installments during the lives of the vendors for property which it has corporate authority to buy, although corporations not organized to deal in annuities are expressly forbidden to do so. The power to pay on such terms as the vendor and purchaser agree is an indispensable incident to the power

to buy and inheres in it. Such a transaction is not a dealing in annuities within the meaning of the prohibition.

4. FIDUCIARY RELATIONS—USE FOR PERSONAL BENEFIT.

Parties in fiduciary relations are prohibited by the law from using their knowledge or power to the detriment of their correlates. No such use can avail them when challenged.

[Ed. Note.—For cases in point, see vol. 12, Cent. Dig. Corporations, §§ 1401–1415.]

5. CORPORATIONS—DIRECTORS MAY NOT USE POWER FOR THEIR OWN BENEFIT.

Contracts and transactions between individuals and corporations of which they are controlling directors or officers, which are unfair, in which the individuals secure an undue or unjust advantage, in which an antagonism between the interest of the individuals and the duty of the officials results in the triumph of the former, are voidable at the option of the corporation or its creditors or stockholders.

[Ed. Note.—For cases in point, see vol. 12, Cent. Dig. Corporations, §§ 1413, 1414.]

6. SAME—TRANSFER OF STOCK BY VOTE OF MAJORITY FOR THEIR OWN BENEFIT VOIDABLE.

The transfer of stock from a corporation to a trustee for a majority of its directors and others by the controlling votes of that majority is voidable at the instance of stockholders who are injured thereby.

7. WILLS—CONSTRUCTION—INTENT OF TESTATOR TO PREVAIL.

The true end of the construction of wills is to ascertain the intention of the testator and to carry it into effect.

This intention must be deduced from the entire will, because the instrument without any part of it fails to clearly express the intention.

The court should put itself as far as possible in the place of the testator, and then, from a consideration of the instrument itself, of the relation of the testator to the parties affected by it, and of the situation of the testator and of the parties in interest when he made it, endeavor to ascertain and give effect to his intention.

[Ed. Note.—For cases in point, see vol. 49, Cent. Dig. Wills, §§ 955, 956, 958, 966.]

8. SAME—WHEN WORDS OF DESIRE, REQUEST, OR RECOMMENDATION RAISE TRUST—WHEN THEY DO NOT.

Words of desire, request, recommendation, or confidence in a will, addressed by a testator to a legatee whom he has the power to command, create no trust in favor of the parties recommended, unless (1) the intention of the testator to make the desire, request, recommendation, or confidence imperative upon the legatee, so that he should have no option to comply or to refuse to comply with it, clearly appears from the whole will and the relation and circumstances of the testator when it was made, (2) unless the subject-matter is certain, and (3) unless the beneficiaries are clearly designated.

When these three conditions exist, a precatory trust may be created in favor of the parties recommended.

[Ed. Note.—For cases in point, see vol. 49, Cent. Dig. Wills, §§ 1587–1589.]

9. SAME—PRECATORY TRUST—TEST OF FIRST CONDITION.

The test of the first condition of a precatory trust is the clear intention of the testator to imperatively control the conduct of the party to whom the language of the will is addressed by the expression of the wish or desire, and not to commit to his discretion the exercise of the option to comply or to refuse to comply with the wish or suggestion expressed.

[Ed. Note.—For cases in point, see vol. 49, Cent. Dig. Wills, §§ 1587–1589.]

**10.** SAME—FACTS—WORDS OF DESIRE WITH DECLARATION THAT THEY SHALL CREATE NO CHARGE RAISE NO TRUST.

B. devised his property to his two brothers, "to be held and disposed of by them absolutely as their own property." He expressed a desire in his will that these brothers should adopt his six children as their heirs and devisees, so that they would share equally with their own children in their advancements and estates, and he declared that nothing in the will, and no request, direction, or bequest made therein, should be construed to create a charge or incumbrance upon any of the property bequeathed to his brothers. *Held*, the will did not create a trust in favor of the six children, either in the estate of the testator or in the property of his brothers.

[Ed. Note.—For cases in point, see vol. 49, Cent. Dig. Wills, §§ 1587–1589.]

**11.** PARENT AND CHILD—ADOPTION—PARENT'S POWER TO DISPOSE OF PROPERTY.

One who adopts a minor as his child and heir has, while living, the same unlimited power of disposition of his property that a natural father has. There can be no heir of the living.

**12.** CONTRACT—OPTION TO RESCIND FOR FRAUD LOST BY DELAY.

One who is induced by fraud to execute a contract has the option to rescind or to affirm it.

Delay, silence, acquiescence, or a retention of the fruits of the agreement for a considerable length of time after a discovery of the fraud is an exercise of the option to affirm, and irrevocably ratifies the agreement.

[Ed. Note.—For cases in point, see vol. 11, Cent. Dig. Contracts, §§ 444–446.]

**13.** SAME—MODIFICATION—ABSENCE OF FRAUD OR MISTAKE.

A contract made without fraud or mistake may not be modified by a court of equity, to give either party a better bargain, while he retains all the benefits of the original trade.

**14.** FAMILY SETTLEMENTS—NOT VOID FOR INADEQUACY OF CONSIDERATION.

Family settlements and compromises of conflicting claims to property are encouraged by the courts. They will not be avoided for inadequacy of consideration, nor without clear proof of fraud or mistake.

[Ed. Note.—For cases in point, see vol. 16, Cent. Dig. Descent and Distribution, §§ 319, 320.]

**15.** SAME—RELIEF IN EQUITY—EVIDENCE.

Four adopted children, who were entitled to an interest in property derived from their adopted fathers of the possible value of $275,000, made a family settlement with one of their adopted fathers and the sons of the other, whereby they accepted 177 shares of stock, then worth $115,000, in a certain corporation, in satisfaction of their interest. Their just proportion of this stock was about 243 shares more. Eleven years later, and after, by another agreement made four years before, they had affirmed the settlement, they wrongfully took from the heirs of the parties who made the settlement with them their interest in certain shares of stock in this corporation, and when the latter brought a suit in equity for the restoration of this interest the adopted children prayed the court to make an equitable redistribution of the stock, or to permit them to retain what they had taken for the purpose of righting the wrong which they had suffered by the family settlement. The adopted father and the sons who participated in that settlement were dead. The stock in the corporation, which was worth $650 per share when the settlement was made, had become worth $4,000 per share. The adopted children had not restored the shares they obtained by the settlement. *Held*, there was no equity in their claim, and a decree for the restoration of the stock they had taken was rightly rendered.

(Syllabus by the Court.)

Appeal from the Circuit Court of the United States for the Western District of Missouri.

For opinion below, see 132 Fed. 485.

These suits present the question whether four of the children of Daniel D. Burnes, deceased, or all the stockholders of the Burnes Estate, a corporation, are the beneficial owners of 300 shares of the capital stock of that corporation, which was the property of Calvin F. Burnes, a brother of Daniel D. Burnes, when he died intestate on July 29, 1896. The capital stock of the corporation is divided into 1,000 shares. Each share of this stock is worth $4,000, so that the amount involved in this litigation exceeds $1,000,000. Calvin F. Burnes owned 375 shares of this stock when he died. Mrs. Winningham, one of the children of Daniel D. Burnes, who, if the appellants are right, became the beneficial owner of 75 shares of this stock, sold it to Lewis C. Burnes, in trust for the corporation, on March 10, 1902, so that the controversy is really narrowed to the ownership of the remaining 300 shares. Daniel D. Burnes died in 1867, and left surviving him six children. In 1889, Mrs. Moore, another of these children, sold her interest in the property which is the subject of the controversy, so that only four of the children of Daniel D. Burnes are interested in the litigation before us. These four children of Daniel are James N. Burnes, 2d, Lewis C. Burnes, Katherine B. Gatch, and Virginia D. Burnes. These children are the only parties in interest on the side of the appellants. Marjorie Burnes and Kennett Burnes, the grandchildren of James N. Burnes, a brother of Daniel, and Frances B. Burnes, the widow of Calvin C. Burnes, one of the sons of James N. Burnes, and the father of Marjorie, are the parties in interest upon the side of the appellees. Kate H. Burnes, the widow, and Mary V. Burnes, the daughter, of Calvin F. Burnes, although appellants, had no pecuniary interest in these suits, because their claims constitute a charge upon the 375 shares of stock which is conceded to be valid by all the parties to the litigation. For convenience and brevity the parties in interest upon the side of the appellants from 1867 to the decree will be termed the children of Daniel, although this designation may at some times include one or both of the two children who during that time parted with their interest in the property. The parties in interest upon the side of the appellees will be called the descendants of James, and the widow and daughter of Calvin F., who were without pecuniary interest in the controversy, will be styled the descendants of Calvin. The entire controversy is between the children of Daniel and the descendants of James.

Calvin F. Burnes died the owner of 375 shares of the stock of the Burnes Estate, and left surviving him his widow and daughter. He died intestate, but left an unexecuted will. After his death an agreement was made to carry out the provisions of this will between the descendants of Calvin, the children of Daniel, the descendants of James, the Burnes Estate, and the Ayr Lawn Company, a corporation whose stock was owned by the Burnes Estate, under which the 375 shares of stock were transferred to Ayr Lawn Company in August, 1896, and that corporation contracted to pay to the widow and daughter of Calvin, or the survivor of them, $1,000 per month as long as either of them should live. The result of this transaction was that the Ayr Lawn Company nominally, and the Burnes Estate really, held this stock, subject to the life estate of the descendants of Calvin, in trust for all the stockholders of the Burnes Estate. In June, 1900, the beneficial ownership of this stock was taken from the stockholders of the corporation and vested in the children of Daniel without notice to the descendants of James. The transaction of 1896 was rescinded. The stock was again vested in the descendants of Calvin, and they conveyed it to Lewis C. Burnes, one of the children of Daniel, in trust for those children, so that each of the five children who were then interested in the property should have the beneficial ownership of 75 shares of it. The children of Daniel agreed to return to the Burnes Estate $52,039.44, which that corporation had paid to the widow and daughter of Calvin in satisfaction of the monthly charge upon the stock, and also undertook to pay to them, or to the survivor of them, $1,000 per month as long as either of them should live. At the time of this rescission the

descendants of James owned 396 shares of the stock of the Burnes Estate and the children of Daniel owned 227 shares. The property of the corporation was then worth more than $3,000,000, and the effect of the rescission was to take property of the value of at least $750,000 from the descendants of James and transfer it to the children of Daniel. When this rescission took place the descendants of James supposed that it merely effected a change of trustees, and that the beneficial ownership of the 375 shares continued in the holders of the other stock of the corporation in proportion to the number of shares they owned. In the latter part of 1902 or the first part of 1903 they first learned that the effect of this transaction had been to divest them of all interest in the 375 shares and to vest their beneficial ownership in the children of Daniel.

Thereupon Frances B. Burnes and Marjorie Burnes exhibited their bill against all the parties in interest to avoid the rescission and to restore the 375 shares to the corporation, subject to the payment of the $1,000 per month to the widow and daughter of Calvin. Answers, cross-bills, and many other pleadings followed; but the effect of all the proceedings and testimony in the court below was that the descendants of James insisted that the 375 shares should be restored to the corporation because they had been taken from it by fraud, while, on the other hand, the children of Daniel maintained that they were entitled to their beneficial ownership and to receive a still larger share of the stock of the corporation under the will of their father and under a deed of adoption made by his brothers James and Calvin in the year 1867. Their father, Daniel D. Burnes, died testate, the owner of property worth $40,000 in that year. He left surviving him six children. By his will he bequeathed all his property to his brothers, James N. and Calvin F., desired them to so adopt his children as their heirs and devisees that they would share equally with their own children in any distribution of their estates that might be made, and provided that nothing in the will should create any charge or incumbrance upon any of the property devised. On May 10, 1867, James N. Burnes and Calvin F. Burnes adopted by deed the six children of Daniel as their lawful heirs, but provided in the deed that it was not their intention that, in case of their intestacy, these children should receive a double inheritance, but that they should each have such a share of their joint and separate estates as would result to them from a division of the sum of the estates among the whole number of their heirs, both lineal and adopted. In the year 1889 James N. Burnes died intestate, and left surviving him his widow, Mary S. Burnes, and his two sons, Calvin C. and Daniel D. Burnes, the second, and the six adopted children of Daniel, all of whom were then of age. At the time of the death of James he and Calvin were copartners, and the title to all their property vested in the latter as the surviving partner. On June 25, 1889, after the death of James, the children of Daniel made a written contract with Calvin F. Burnes and his wife, in which the will of their father and the deed of adoption were recited at length, whereby they released Calvin and his wife from all present and future claims to any part of their estates, and Calvin agreed to convey all his property and all property left by Daniel to the Burnes Estate, a corporation which they were then to form, and that he would vest in the four children of Daniel, who are parties in interest in these suits, the title to 177/1000 of the stock of that corporation and would join in an agreement that a dividend of 40 per cent. should be paid upon the stock of the corporation annually during its existence. The four children of Daniel made an agreement with the widow and sons of James at the same time, but this contract was lost and the contents of it are unknown. The corporation was formed. All the property of Calvin F. and all the property of the estates of Daniel and of James was conveyed to it, and 177 of the 1,000 shares of its capital stock were issued to the four children of Daniel. James and Calvin had theretofore advanced out of the property to the sons of James about $100,000 more than they had furnished to the children of Daniel. But the latter were ignorant of this fact until some time in the year 1899, after the death of Daniel D. Burnes, 2d, one of these sons.

The property of these brothers which went to the corporation in this transaction was in the year 1889 worth $650,000. If the sons of James had been

137 F.—50

charged with the advances they had received, and this property had been then divided between the widow of James, the wife of Calvin, and the children of the three brothers, and a child's share had been given to the widow and a child's share to the wife (Rev. St. Mo. 1899, § 2937), a proper apportionment of the stock, so that each of the four children of Daniel would have received a share of the property equal to that which would have been obtained in this way by each of the children of James and Calvin, would have given to the four children of Daniel about 420, instead of 177, shares of the stock of the corporation, and would have increased their interest in its property about $160,000. They urge that the contract of settlement of 1889 and the division of the stock which was based upon it violated the trust with which the property was charged, that the agreement of settlement was secured by fraud and by an unjustifiable concealment of the advances to the sons of James, and that the court should redistribute the stock of the corporation in accordance with the will of Daniel, with the deed of adoption, and with the rules and principles of equity.

The court below granted the relief sought by the complainants, restored the 375 shares to the Burnes Estate, and refused all relief to the children of Daniel. Burnes v. Burnes, 132 Fed. 485.

Stephen S. Brown, F. W. Lehmann, and M. A. Low (John E. Dolman and Lewis N. Gatch, on the brief), for appellants.

O. M. Spencer and Frank Hagerman (Culver, Phillip & Spencer; Noble B. Judah, and Vinton Pike, on the brief), for appellees.

Before SANBORN and VAN DEVANTER, Circuit Judges, and RINER, District Judge.

SANBORN, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The children of Daniel assail the decree, which restores the ownership of the 375 shares, subject to the monthly charge of $1,000, to the Burnes Estate, upon the grounds (1) that this ownership was never legally vested in that corporation; (2) that, if it was, the corporation was lawfully divested of all interest in it in June, 1900; and (3) that if the transfer from the Burnes Estate to Lewis C. Burnes, in trust for the children of Daniel, in 1900, was illegal or voidable, yet the rule that he who seeks equity must do equity, and the concealment and injustice inflicted upon them at the time of the settlement of 1889 and at the time of the contract of 1896, justify the transfer, and require a court of chancery either to sustain it or to condition its avoidance with an equitable redistribution of all the stock of the corporation. It is said that the title to the 375 shares of stock was in the administrators of the estate of Calvin when its transfer to the Burnes Estate was made, and that it never passed from these administrators to that corporation. The transfer under consideration was actually made to the Ayr Lawn Company; but, as the Burnes Estate owned the stock of that corporation, it will be termed a transfer to the Burnes Estate, and the Ayr Lawn Company will thus be eliminated from the discussion. Calvin F. Burnes died on July 29, 1896. On August 21st in that year his widow filed in the probate court a waiver of her right to administer upon his estate. Lewis C. Burnes, James N. Burnes, 2d, and Daniel D. Burnes, 2d, were appointed administrators of the estate, upon an application in which they alleged that the heirs

of Calvin were his widow, his daughter, and the Burnes Estate. They then filed an inventory, in which they declared that the only property of this estate was the 375 shares of stock and that Calvin owed no debts or obligations when he died. On August 22, 1896, they delivered the certificate of these shares of stock to the descendants of Calvin and the Burnes Estate and took their receipt for it. On November 10, 1897, they filed their annual account and settlement in the probate court, in which they charged themselves with the receipt, and credited themselves with the delivery of this certificate to the descendants of Calvin and the Burnes Estate. On November 14, 1898, upon due notice, their final account and settlement, which contained no other charges or credits, was approved, and they were finally discharged by an order of the probate court which recited that the estate of Calvin had been fully administered and finally distributed. On August 24, 1896, the children of Daniel, the descendants of James, the descendants of Calvin, and the Burnes Estate made the contract that these 375 shares should become the property of the Burnes Estate, and that the latter would pay to the descendants of Calvin, or to the survivor of them, $1,000 per month as long as either of them should live. The 375 shares were thereupon transferred, pursuant to this agreement, to the Ayr Lawn Company.

Upon the death of the owner the title to his personal property vests in the administrators of his estate, and not in its distributees, under the laws of the state of Missouri, and in a controversy between them over its title or possession the former prevail. Smith v. Denny, 37 Mo. 20; Hanenkamp v. Borgmier, 32 Mo. 569; Green v. Tittman, 124 Mo. 372, 27 S. W. 391; Becraft v. Lewis, 41 Mo. App. 546; State v. Moore, 18 Mo. App. 406; Adey v. Adey, 58 Mo. App. 408. The Supreme Court of that state has decided that distributees may, and that distributees may not, maintain an action to enforce an obligation to an estate while an administrator of it remains in office. State v. Stephenson, 12 Mo. 179, 183; Green v. Tittman, 124 Mo. 372, 27 S. W. 391. But administrators may vest in the distributees of an estate both title and possession of their respective shares of its property before an order of distribution is made by the probate court. They are but trustees, who hold the legal title and possession for the benefit of the distributees, and their conveyance to those who must ultimately be entitled to it estops them from again claiming it, and vests the legal as well as the beneficial ownership in the grantees. There were no creditors of the estate of Calvin. His descendants and the Burnes Estate alone claimed to be his heirs throughout the proceedings in the probate court. In August, 1896, the administrators conveyed all the personal property of the estate to these claimants. This distribution of it was reported to and approved by the probate court upon the settlement of their final account in November, 1898. That approval related back to and confirmed the conveyance of the stock, as of the date of its delivery, to the distributees, and no title to or interest in it remained in the administrators after that date. The

conveyance by administrators to distributees of their respective shares of the personal property of an estate, which is not previously authorized, but which is subsequently approved, by the proper probate court, divests all title and interest therein from the administrators, and vests it in the distributees as of the date of the conveyance. Young v. Thrasher, 48 Mo. App. 327, 334–335; Woerner's American Law of Administration (2d Ed.) § 519. Moreover, in the absence of fraud, the judgment of the probate court, to which all persons interested in the estate of Calvin were legally parties, whether they were named in the proceeding or not, and the written contract of 1896, which they executed, estopped the children of Daniel and all other parties to that agreement from claiming that the title to this stock did not vest in the Burnes Estate. Even fraud could not restore that title to the administrators of the estate of Calvin. Its utmost effect would be to charge the title in the hands of those who received it with a trust in favor of its victims. The administrators of the estate of Calvin, therefore, retained no right, title, or interest in the 375 shares of stock after they delivered it to the descendants of Calvin and the Burnes Estate on August 22, 1896.

Another argument is presented in support of the claim that the Burnes Estate never acquired any title or interest in the 375 shares of stock. It is that the statutes of Missouri under which it was organized gave it no power to grant annuities, that the Constitution and the statutes prohibited it from dealing in them, and that upon this account its contract to pay the $1,000 a month to the descendants of Calvin was beyond the powers of the corporation and void. Const. Mo. art. 12, § 7; Rev. St. Mo. 1899, §§ 1319, 7852, 7990. But these provisions of the Constitution and of the statutes go no farther than to prohibit corporations, like the Burnes Estate, which are organized for pecuniary profit, but not for the specific purpose of granting, purchasing, and disposing of annuities, from so doing. It is conceded that, if the main purpose of the transaction under consideration had been to grant or to sell an annuity or to engage in the business of dealing in annuities, it might have fallen under the ban of these inhibitions. But it was not the intent of the people or of the Legislature, and it is not the legal effect or meaning of the prohibitions here under consideration, to forbid a corporation organized for pecuniary gain to make or discharge obligations which it is authorized to incur in the transaction of its legitimate business. A corporation of this nature is authorized to pay for property, which it has the power to purchase, in cash and in monthly or yearly installments, either during stated periods or during the lives of the payees. Such payments may in fact constitute annuities; but they are the means or incidents to the accomplishment of the purpose or business which the corporation is authorized to transact, and hence they are within its granted powers. While the powers of a corporation are limited to those expressly granted and those fairly incidental thereto, they include the latter as completely as the former, and they always in-

clude the indispensable and the suitable means to exercise the granted powers. In the absence of constitutional or statutory prohibition, corporations have inherent power to buy, to sell, and to retire their own stock. Commissioners v. Thayer, 94 U. S. 631, 643, 24 L. Ed. 133; City Bank v. Bruce, 17 N. Y. 507, 511; First National Bank v. Salem Capitol Flour Mills Co. (C. C.) 39 Fed. 89, 95; Lowe v. Pioneer Threshing Co. (C. C.) 70 Fed. 646, 647; In re S. P. Smith Lumber Co. (D. C.) 132 Fed. 618, 619; New England Trust Co. v. Abbott, 162 Mass. 148, 38 N. E. 432, 27 L. R. A. 271. There is no such inhibition in the state of Missouri. The purchase of the 375 shares by the Burnes Estate was, therefore, within its corporate powers, and, as it had authority to buy these shares of stock, it had the corporate power to pay for them either in cash or by its promise to pay the agreed price in monthly or yearly installments during such periods of time as should be fixed by the meeting of the minds of the parties. The title to the 375 shares of stock was therefore legally vested in the Burnes Estate in 1896, although that corporation agreed to pay for it in monthly installments during the lives of the descendants of Calvin or their survivor.

Was the title to these shares lawfully taken from the corporation and vested in Lewis C. Burnes, in trust for the children of Daniel, in June, 1900, after the death of Daniel D. Burnes, 2d? At that time the children of Daniel owned 227 shares, and the descendants of James 396 shares, of the stock of this corporation. The transfer of the 375 shares from the Burnes Estate to Lewis C. Burnes, in trust for the children of Daniel, took property of the value of at least $750,000 from the descendants of James and vested it in the children of Daniel. It did more than this. It took the control of the corporation from the former and transferred it to the latter; for the 375 shares, together with the 227 shares owned by the children of Daniel, constituted a majority of all the stock of the corporation. Lewis C. Burnes, one of the children of Daniel, procured this transfer. He persuaded the descendants of Calvin to demand a rescission of the sale and settlement of 1896. He was the president of the corporation. Its board of directors consisted of himself and two other children of Daniel and two of the descendants of James. The resolutions of that board, which authorized the rescission of the transaction of 1896 and the retransfer of the shares to the descendants of Calvin, were adopted by the votes of the three children of Daniel for whose benefit this action was had. Only one of the descendants of James, Frances B. Burnes, was present when these resolutions were adopted, and she cast no vote. Lewis C. Burnes was the manager of the property, the agent and the confidential adviser of the descendants of James. He failed to tell them, and they did not know, that the purpose and effect of this transaction were to divest them of all interest in the 375 shares and to vest it in the children of Daniel. It is true that he testified that he fully informed Frances B. Burnes of its purpose and result at the time of the transaction. But she denied this statement, and testified that he assured her that its only purpose was to

better secure the payment of the $1,000 per month to the descend-. ants of Calvin, and that it did not and would not in any way affect the interests of the descendants of James. Her testimony upon this issue, and the undisputed facts that he did not inform Marjorie Burnes or Kennett Burnes that they were deprived of their interest in this stock by this transfer; that none of the descendants of James knew of the agreement which he executed to hold this stock in trust for the children of Daniel until one of their number accidentally discovered it more than two years later, while reading the conveyance of Mrs. Winningham which recited it; that Lewis thereafter refused to permit their representative to examine this contract; and that as soon as they were aware of it they took steps to recover this property—convince that none of them had either notice or knowledge that they were deprived of their interest in the 375 shares by the transaction of June, 1900, until more than two years after it was consummated. The result is that by authority of resolutions of the board of directors of the Burnes Estate passed by the votes of a majority of the board which consisted of three of the children of Daniel, one of whom was the president of the corporation, the agent and confidential adviser of the descendants of James, property of the value of $750,000 was taken from the latter without their knowledge and transferred to the children of Daniel. The three children of Daniel who constituted the majority of the board which passed these resolutions were individually interested in their adoption to the extent of hundreds of thousands of dollars, and their interest was diametrically opposed to that of the corporation. Parties in fiduciary relations are imperatively forbidden by the law to use their knowledge or their power to the detriment of their correlates, and no such use can ever avail them when challenged in a court of equity. Trice v. Comstock, 57 C. C. A. 647, 651–653, 121 Fed. 620, 624–626, 61 L. R. A. 176; McKinley v. Williams, 20 C. C. A. 312, 313, 74 Fed. 94, 95.

Contracts and transactions between individuals and corporations of which they are controlling directors or officers, which are unfair, in which the individuals secure any undue or unjust advantage, in which an antagonism between the interest of the individuals and the duty of the officials has resulted in the triumph of the former, are voidable at the option of the corporation or its creditors or stockholders. Wyman v. Bowman, 62 C. C. A. 189, 191, 206, 127 Fed. 257, 259, 274; Bradley v. Farwell, 3 Fed. Cas. 1146, 1151, No. 1,779; Koehler v. Black River Falls Iron Co., 2 Black, 715, 719, 17 L. Ed. 339; Wilbur v. Lynde, 49 Cal. 290, 19 Am. Rep. 645; Davis v. Rock Creek, etc., Co., 55 Cal. 359, 36 Am. Rep. 40; Kankakee Woolen Mill Co. v. Kampe, 38 Mo. App. 229, 234; Union National Bank v. Douglass, Fed. Cas. No. 14,375; Haywood v. Lincoln Lumber Co., 64 Wis. 639, 647, 26 N. W. 184. The transaction whereby the 375 shares of stock were taken from the corporation and transferred to Lewis C. Burnes, in trust for the children of Daniel, was upon its face unfair and without justification either at law or in equity, and it was rightly avoided by the court below, un-

less it was in fact just and fair, unless the descendants of James were thereby deprived of no right or interest which really belonged to them, and the children of Daniel secured no property or advantage to which they were not equitably entitled. But a court of chancery may, in a case in which the rules and principles of equity demand it, compel those who seek equity to do equity, may condition its grant of the relief they seek with the enforcement of claims or equities held by their opponents, and may do complete justice between the parties. Farmers' Loan & Trust Co. v. Denver, L. & G. R. Co., 60 C. C. A. 588, 593, 126 Fed. 46, 51, and cases there cited; Lynch v. Burt (C. C. A.) 132 Fed. 417, 432.

Counsel for the children of Daniel maintain that the transfer of the 375 shares of stock to them in 1900 only partially righted the frauds perpetrated and the wrongs inflicted upon them in 1889 and 1896, and that in equity and good conscience they are entitled to a still larger share of the stock of the corporation than they secured. They base this contention on the will of their father, on the deed of adoption, and on the claim that they were induced by fraud and concealment to make the contracts of 1889 and 1896. They insist that from the time of the acceptance of the property of their father by James and Calvin under his will in 1867 all of the property of the three brothers was charged with a trust for the benefit of the children of each of them in equal shares, that property of the value of $100,000 was diverted from this trust and advanced to the descendants of James prior to 1889, and that in ignorance of this fact they were fraudulently induced to make the contracts of that year and of 1896, under which they consented to accept less than their just share of the stock of the Burnes Estate.

The first question for consideration under this contention is: Did the will of Daniel charge his estate or the property of his brothers with such a trust? The material provisions of that will are:

"First. I devise and bequeath unto James N. Burnes and Calvin F. Burnes, my brothers, all my real and personal estate, wherever situated, all rights in action, and all property in reversion, expectancy, and of inheritance, to be held and disposed of by them absolutely as their own property."

"Third. It is my desire that my two said brothers shall, according to the laws of the state of Missouri, adopt my six children, James N., Mary, Emma, Katie, Lewis, and Virginia, as their heirs and devisees, to share equally with their own children in any distribution of their estate or estates which may be made, and I desire that they shall have the care, custody, and control of my said children, and provide for, educate, and maintain them until they arrive at the age of twenty-one years, and longer if necessary, that they make to them the same advancements as they make to their own children, and in every respect deal with them as with their own."

"Fifth. Nothing in this will, and no request, direction, or bequest made herein, shall be so construed as to create a charge or incumbrance upon any of the property bequeathed to my brothers, James N. Burnes and Calvin F. Burnes."

Reduced to its lowest terms, this instrument expresses three things—a devise of the property of the testator absolutely to the two brothers; a desire that they shall adopt his children as their heirs, so that they will share in their estates and in their advance-

ments equally with their own children; and a mandate that nothing in the will shall create any charge upon any of the property bequeathed to them. A will is "the legal declaration of a man's intentions, which he wills to be performed after his death." 2 Blackstone's Com. 499. It is his will, his purpose, his intention, legally and effectively expressed. Hence the true end of all construction of wills is to ascertain the intention of the testator, and, when that is once discovered, it prevails, regardless of inapt expressions and the dry words of the testament, unless prohibited by established rules of law. This intention must be deduced, not from specific provisions or fragmentary parts of the instrument, but from its entire context, from all its provisions taken together, because the intention is not evidenced by any part or provision of it, or by the will without any part or provision, but by every part and term so construed as to be consonant with every other and with the entire testament. The court may, and it should as far as possible, put itself in the place of the testator when he made his will, and then, from a consideration of the instrument itself, of the relation of the testator to the parties affected by it, and of the circumstances and situation of the testator, and of the parties in interest at the time of its execution, endeavor to ascertain his actual intention and to carry it into effect. Smith v. Bell, 6 Pet. 68, 74, 8 L. Ed. 322; Colton v. Colton, 127 U. S. 300, 314, 8 Sup. Ct. 1164, 32 L. Ed. 138; Pressed Steel Car Co. v. Eastern Ry. Co., 57 C. C. A. 635, 637, 121 Fed. 609, 611; Rev. St. Mo. 1899, § 4650.

The crucial question in the interpretation of this will is, did the testator intend to impose an imperative obligation upon his brothers to apply his estate, or their property, to the equal benefit of all the children of each of them, or to express a desire that they should do so, and to intrust to their discretion the exercise of the option to comply or to refuse to comply with his wish? In Knight v. Knight, 3 Beav. 148, 172–174, Lord Langdale declared the law upon this subject in language which has rarely, if ever, been excelled in strength and clearness. He said:

"As a general rule, it has been laid down that when property is g'·en absolutely to any person, and the same person is by the giver, who has power to command, recommended or entreated or wished to dispose of that property in favor of another, the recommendation, entreaty, or wish shall be held to create a trust: First, if the words are so used that, upon the whole, they ought to be construed as imperative; secondly, if the subject of the recommendation or wish be certain; and, thirdly, if the objects or persons intended to have the benefit of the recommendation or wish be also certain. * * * On the other hand, if the giver accompanies his expression of wish or request by other words, from which it is to be collected that he did not intend the wish to be imperative, or if it appears from the context that the first taker was intended to have a discretionary power to withdraw any part of the subject from the object of the wish or request, or if the objects are not such as may be ascertained with sufficient certainty, it has been held that no trust is created."

It is clear that under this general rule two classes of cases arise: One in which there is a devise to a legatee absolutely, and the expression of a desire, recommendation, or confidence, without more, that the devisee will provide for others out of a certain sub-

ject-matter or property; and another class in which such a devise and expression are accompanied by other terms from which' the conclusion may be deduced that the testator did not intend the wish to be imperative or in which the subject of it is uncertain. The authorities cited by counsel for the children of Daniel in support of their claim that his will created a precatory trust are of the first class.

In Colton v. Colton, 127 U. S. 300, 8 Sup. Ct. 1164, 32 L. Ed. 138, the will read:

"I give and bequeath to my said wife, Ellen M. Colton, all of the estate, real and personal, of which I shall die seised or possessed, or entitled to. I recommend to· her the care and protection of my mother and sister, and request her to make such gift and provision for them as in her judgment will be best."

In Noe v. Kern, 93 Mo. 367, 369, 6 S. W. 239, 3 Am. St. Rep. 544, the provisions were:

"I give, devise, bequeath unto my husband, William Ferguson, all of my real and personal estate, absolutely. * * * I make this bequest in the full faith that my husband will properly ·provide for the two children of my deceased brother, Simeon, whom we have undertaken to raise and educate."

In Murphy v. Carlin, 113 Mo. 112, 20 S. W. 786, 35 Am. St. Rep. 699, there was a devise of the remainder of the property of the testator, after the payment of certain legacies, to his wife, and to her heirs and assigns, forever, accompanied with this provision:

"It is my will and desire that my wife continue to provide for the care, comfort, and education of Thomas Joseph Murphy now aged nearly five years, * * * and to make suitable provision for him in case·of her death."

In Bakert v. Bakert, 86 Mo. App. 83, 86, the provisions were:

"It is my will that my sons Caldwell Bakert and Barnett Bakert have all of my real estate. * * * It is my will that my sons Barnett Bakert and Caldwell Bakert support their mother and single sister off of the proceeds of the farm I bequeath to them so long as they may see fit and proper to live with my sons."

In none of these cases, or of any of the other cases cited by counsel for the appellants which sustain precatory trusts, did the wills contain other terms which declared or indicated that the expression ·of the will, desire, or confidence was not intended to create any trust upon the·property devised. The will here under consideration differs from those which were the subjects of the decisions cited in this: that it contains a distinct paragraph which commands that:

"Nothing in this will, and no request, direction, or bequest made herein, shall be so construed as to create a charge or incumbrance upon any of the property bequeathed to my brothers."

In Briggs v. Penny, 3 Macn. & Gord. 546, 554, the Lord Chancellor, in discussing this subject, said:

"I conceive the rule of construction to be that words accompanying a gift or bequest, expressive of confidence, or belief, or desire, or hope that a particular application will be made of such bequest, will be deemed to import ·a trust upon these conditions: First, that they are so used as to exclude all

option or discretion in the party who is to act, as to his acting according to them or not; secondly, the subject must be certain; and, thirdly, the objects expressed must not be too vague or indefinite to be enforced."

In Williams v. Williams, 1 Simons, N. S. 358, 369, Vice Chancellor Cranworth declared that:

"The point really to be decided in all these cases is whether, looking at the whole context of the will, the testator has meant to impose an obligation on the legatee to carry his express wishes into effect, or whether, having expressed his wishes, he has meant to leave it to the legatee to act on them or not, at his discretion."

In Story's Eq. Jur. § 1070, the author thus states the result of the authorities:

"Wherever, therefore, the objects of the supposed recommendatory trusts are not certain or definite; wherever the property to which it is to attach is not certain or definite; wherever a clear discretion and choice to act or not to act is given; wherever the prior dispositions of the property import absolute and uncontrollable ownership—in all such cases, courts of equity will not create a trust from words of this character."

In Warner v. Bates, 98 Mass. 274, 277, Chief Justice Bigelow declared that the test of a precatory trust was:

"That to create a trust it must clearly appear that the testator intended to govern and control the conduct of the party to whom the language of the will is addressed, and did not design it as an expression or indication of that which the testator thought would be a reasonable exercise of a discretion which he intended to repose in the legatee or devisee."

This declaration was approved by the Supreme Court in Colton v. Colton, 127 U. S. 300, at page 314, 8 Sup. Ct. 1164, at page 1170, 32 L. Ed. 138.

In Hess v. Singler, 114 Mass. 56, 59, 60, there was a devise of the residue of the estate to the son of the testator, his heirs and assigns, forever, and a further clause in the will in these words:

"I hereby signify to my said son my desire and hope that he will so provide by will or otherwise that, in case he shall die leaving no lawful issue living, the property which he will take under this will shall go in equal shares" to certain persons therein named.

Gray, C. J., afterwards Mr. Justice Gray of the Supreme Court, delivered the opinion of the court, which denied the creation of a precatory trust, and said:

"In order to create a trust, it must appear that the words were intended by the testator to be imperative; and, when property is given absolutely and without restriction, a trust is not to be lightly imposed upon mere words of recommendation and confidence."

The tendency of the modern decisions, both in England and in this country, is to restrict the practice which deduces a trust from the expression by a testator of a wish, desire, or recommendation regarding the disposition of property absolutely bequeathed. 2 Story's Eq. Jur. § 1069; Lambe v. Eames. L. R. 10 Eq. Cas. 267; In re Hutchinson and Tenant, L. R. 8 Ch. Div. 540; Pomeroy's Eq. Jur. (2d Ed.) § 1015; Foose v. Whitmore, 82 N. Y. 405, 406, 37 Am. Rep. 572.

In the case of In re Hutchinson and Tenant, supra, a testator gave all his property to his wife "absolutely, with full power for her to

dispose of the same as she may think fit for the benefit of my family, having full confidence that she will do so"; and the court said:

"Both on principle and in consonance with the most modern authorities, I decide that the widow took absolutely."

In Corby v. Corby, 85 Mo. 371, 395, after reviewing many cases, the Supreme Court of Missouri says:

"These cases and the case referred to in the opinions of the judges, and the entire current of modern authorities, too numerous for citation, have established the rule that trusts are not to be created for the purpose of carrying out the declared wishes or confidences of a testator until he himself by his will has manifested a clear intention of creating a trust."

Pomeroy in his work on Equity Jurisprudence, § 1016, says:

"Upon the authority of the more modern decisions the whole doctrine may be summed up in a single proposition: In order that a trust may arise from the use of precatory words, the court must be satisfied from the words themselves, taken in connection with all the other terms of the disposition, that the testator's intention to create an express trust was as full, complete, settled, and sure as though he had given the property to hold upon a trust declared in express terms in the ordinary manner. Unless a gift to A., with precatory words in favor of B., is in fact equivalent in its meaning, intention, and effect to a gift to A. 'in trust for B.,' then certainly no trust should be inferred."

From the authorities to which reference has now been made, and from others too numerous for review, which treat of this subject, these rules are fairly deducible: There is a simple, sure, and familiar form of bequest to raise a trust, which consists of a devise to the legatee in trust for the beneficiary, and a failure to use it indicates an intention to avoid the creation of a trust. Words of desire, request, recommendation, or confidence in a will, addressed by a testator to a legatee whom he has the power to command, create no trust in favor of the parties recommended, unless (1) the intention of the testator to make the desire, request, recommendation, or confidence imperative upon the legatee, so that he shall have no option to comply or to refuse to comply with it, clearly appears from the whole will and the relation and circumstances of the testator when it was made, (2) unless the subject-matter of the wish or recommendation is certain, and (3) unless the beneficiaries are clearly designated. When these three conditions exist, a precatory trust may be raised. The test of the creation of the trust is the clear intention of the testator to imperatively control the conduct of the party to whom the language of the will is addressed by the expression of the wish or desire, and not to commit to his discretion the exercise of the option to comply or to refuse to comply with the wish or suggestion expressed.

It is not now difficult, in the light of the decisions to which reference has been made and the rules of law deducible from them, to determine the question whether or not a trust was raised by the will of Daniel D. Burnes. At the time he executed it he was a widower with six children, the oldest of whom was 14 years and the youngest but a few months of age. He had two brothers, who were active business men. He was a lawyer. He knew that a devise to his two brothers in trust for his six children would

establish an impregnable trust. He knew that a bequest to the two brothers on condition that they adopt the six children in such a way that they should share equally with their own in their advancements and estates would, if accepted by the legatees, create a valid trust. He made no such devises, and from this fact the presumption unavoidably arises that he intended to create no such trusts. He bequeathed all his property to his brothers, "to be held and disposed of by them absolutely as their own property." He expressed a desire that they should so adopt his children that they would share equally with their own in their advancements and estates. If he had left this subject here, and the two brothers had accepted the bequest as they did, the question might have been debatable whether or not he intended to charge his estate with a trust or to condition their acceptance of it with the creation of a trust in their property. This fact evidently did not escape the testator, and he removed the doubt. He added to his will another clause, wherein he declared his intention upon this subject in unmistakable terms. He willed that:

"Nothing in this will, and no request, direction, or bequest made herein, shall be so construed as to create a charge or incumbrance upon any of the property bequeathed to my brothers James N. Burnes and Calvin F. Burnes."

The legal knowledge and character of the testator, his intimate acquaintance with the ability and dispositions of his brothers, his failure to devise his property in trust, or to condition its acceptance with the charge of a trust upon the property of his brothers by the use of any of the customary and simple forms of devise for such purposes, and his clear declaration in the fifth paragraph of his will of his intention that there should be no such charge, converge upon the mind with compelling power, and leave it no other rational conclusion than that he neither intended to, nor did, create any trust in favor of his children, either in the estate which he left or in the property of his brothers. Trusting, and, as the event proved, wisely trusting, in the ability, industry, frugality, and affection of his brothers, he intended to, and he did, devise his property to them without charge or incumbrance. He intended to confide and he did confide to their discretion the exercise of the option to fulfill or to refuse to gratify the desire he expressed in the third paragraph of his will, and no trust in favor of his children arose under that instrument.

The conclusion that the will of Daniel created no trust strikes down the chief proposition upon which the claim of his children to secure an avoidance or disregard of the contracts of 1889 and 1896 and a redistribution of the stock of the Burnes Estate is founded. That proposition is that they were induced to make these agreements by the fraudulent concealment of the fact that Calvin and James had advanced to the descendants of the latter about $100,000 more than they had furnished to the children of Daniel. If the property derived from the three brothers had been charged with a trust, or if any obligation or duty had been imposed upon James and Calvin to make equal advances while they lived to their

adopted and their natural children, this fact would have been material to the rights of the parties in 1889, and might well have influenced the terms of the settlement. We have seen that no such trust, obligation, or duty was imposed by the will. Neither was it by the deed of adoption which followed the will. That instrument went no farther than to make the six children of Daniel equal heirs of James and Calvin in case of their intestacy. But one who adopts a minor as his child and heir has, while living, the same unlimited power of disposition of his property that a natural father has. Steele v. Steele, 161 Mo. 566, 573, 574, 61 S. W. 815. Hence the fact that a gift or advancement of $100,000 had been made to the descendants of James prior to his death was entirely immaterial to the rights of the parties after his decease, and to the contracts of 1889 and 1896, and the ignorance of the children of Daniel concerning it, or its concealment from them, presents no substantial ground for the avoidance or repudiation of the settlement they made.

It is, however, earnestly argued that the distribution of the stock under these contracts was violative of the legal rights of the children of Daniel, that it was inequitable, that in 1889 Calvin was the father by adoption of the children of Daniel, and, as surviving partner of his brother, the trustee of all the property, and that by the use of his fiduciary relation, of his power as trustee, and of a threat that, if the children refused to execute the contract of that year, they must enforce their rights in the courts, he induced them to make the agreement under which the stock was divided, and that on account of these facts the court should make an equitable redistribution of it. The contract of 1889 was obviously intended to constitute a final settlement of the claims of all parties to it to any share in the estate of James, in the property of Calvin, or in the stock of the new corporation then to be formed. The unsigned will of Calvin and the agreement of 1896 were but the execution of that settlement. It may be, as counsel insist, that the agreement of 1889 did not legally deprive the children of Daniel of their expectancy in the estate of Calvin, and that upon his death they were legally entitled to their shares of his estate as his heirs, notwithstanding the contract of 1889. Nevertheless the evidence, the acts, and the silence of the parties, whereby they affirmed and preserved the distribution of 1889 throughout the administration of the estate of Calvin and for 11 years after it was made, until Calvin and every one who was an active party to it in the interest of the descendants of James, were dead, demonstrate the fact that the minds of all the parties to that settlement met in 1889 upon the proposition that the contract of that year finally fixed and determined the interests of all in all of the property derived from the three brothers, and that from this conclusion their minds never parted until after the death of the last active male member of the descendants of James. The contract of 1889 and the equity of disregarding it must accordingly be considered upon the theory that it was a final settlement of the interests of the parties to it in the estate of James, in the property of Calvin, and in the corporation that was to be formed.

An exact statement of the interests of the various parties in the

property which is the subject of this controversy is not material to the determination of the questions presented, and it is not attempted. The statement of facts in this regard is only intended to generally portray the situation of the parties and their interests. When the settlement was made an equitable distribution of the stock would have assigned to the four children of Daniel, who seek the redistribution, about 243 more shares than they actually received, and would have increased their interest in the property of the corporation about $160,000. But they had no legal right to any shares of this stock, to any interest in this corporation, or to any share in the property of Calvin. The limit of their legal rights when the settlement was made was to receive four-ninths of the estate of James, which would have been a share of the property of that estate worth $145,000. They received by the settlement 177 shares of the stock of the Burnes Estate, which was then worth about $115,000. They received less than their share; but they were not alone in this situation. Calvin himself received only 375 shares, when he was legally entitled to 500. The interest he secured in the corporation was worth $79,000 less than his legal share. The fact undoubtedly is that the contract and distribution evidenced a compromise of conflicting claims to the property, under which the descendants of James secured more, while Calvin and the children of Daniel obtained less, than their just shares, perhaps in consideration that the entire property should be preserved intact and kept under the successful management of Calvin and the sons of James. Whatever the consideration was, the effect of the settlement, stated in the most favorable light for the four children of Daniel, was this: They paid a possible $275,000 in property, of which they were then legally entitled to only $145,000, for stock of the Burnes Estate which was worth only $115,000. But the fact that one pays too much for property which he buys, or that he surrenders a part of his property or of his rights to secure a compromise of conflicting claims to it, furnishes no sound reason for a rescission of the sale, or for a repudiation or modification of the compromise. Smith v. Smith, 36 Ga. 184, 191, 193, 91 Am. Dec. 761.

Calvin, indeed, held all the property as trustee for the parties in interest. He was the adopted father of the children of Daniel He occupied a fiduciary relation to them which imposed upon him the duty of fair dealing, of a full disclosure of all material facts, and of the utmost good faith, and prohibited him from securing any advantage to himself or to others by the use of his relation or position. But did he fail to discharge this duty or violate this inhibition? The advances to the sons of James and the value of the estate of Daniel in 1867, of which much is said in argument, were facts which did not condition and were not material to the rights of the parties or to the terms of the contract in the year 1889, and the failure to disclose them was no breach of his duty. He spread the will and the deed of adoption before the children of Daniel and embodied them in the contract of settlement. He and James had taken these children into their families, provided them with a home, maintained, cared for, and educated them with their

own children from the death of their father in 1867 until they arrived at years of maturity. When the boys became of age they were employed at small salaries in the operation of the property. When the agreement of settlement was made all the children of Daniel were of age. Those who caused this controversy had enjoyed a business experience of some years. James N., the younger, was 35 years, and Lewis C. Burnes was 28 years, old. One of the daughters was married to a lawyer, who considered, discussed, and refused the settlement, and she then sold her interest in the property. These children were not ignorant that much more money had been advanced to and spent by the descendants of James than they had received. They had not known of the will of their father or of the deed of adoption until the year 1889, but they were aware of them and the advisability of accepting the proposition embodied in the contract as a final settlement of their rights in the property under them had been the subject of consideration, discussion, and conference among them for at least four months before the contract was finally executed. They had once agreed to refuse to make it. Wiser counsels, however, subsequently prevailed, and all signed it but Mrs. Moore. This is not a case where a trustee took advantage of his relation to his cestuis que trust to conceal material facts and to secure an advantage for himself. He, like the children of Daniel, received less than his lawful share.

It is, however, insisted that he used his power and relation unjustly to the advantage of the descendants of James, and that this is equally fatal to the settlement as his use of them for his own benefit. But does the record sustain this charge? While it is true that the descendants of James obtained more than their just share of the stock, a careful perusal of the evidence fails to satisfy that they secured it through any unjust influence or censurable act of the trustee. His threat to the children of Daniel that they must accept the compromise offered by the agreement or secure their rights from the courts can hardly be said to be reprehensible, in view of the fact that such must have been the result of his failure to induce the conflicting claimants to agree, and that courts are established for the express purpose of protecting and enforcing such rights. What controversy he had with the descendants of James, how strenuous were his efforts to secure their approval of the settlement before they consented to the compromise, we cannot know, because the mouths of Calvin and of the sons of James had been closed in death before these suits were instituted. The evidence does not present a case where the trustee wrongfully used his fiduciary relation to deprive any of his cestuis que trust of their just rights. It discloses a case, rather, where the trustee, standing between two contending factions, sacrificed $79,000 of his own property to preserve peace in his family, to effect a settlement of conflicting claims, and to keep the property of the children of Daniel, as well as that of all the other members of his family, under the management of those who had raised and educated the former and had so cared for their financial interests that their property, which was not worth more than $40,000 in 1867, had become of

the value of at least $200,000 when the settlement of 1889 was made. When this settlement was made the children of Daniel were of age and the sons had experienced the benefit of many years of business activity. They knew all the material facts which conditioned their rights. They were not induced to execute the agreement of compromise by fraud, and there is no sound reason why a court of equity should now interfere to avoid it, or to assist them to repudiate it. On the other hand, there are insuperable objections to such a course.

The descendants of James have relied and acted upon the contract of settlement for 12 years without notice of objection to it, and the children of Daniel by their assent to it are estopped from assailing or repudiating it and the courts from assisting them to do so. Even if the fiduciary relation and power of the trustee, Calvin, had obscured their mental vision and fraudulently induced them to assent to the settlement in 1889, they must have discovered this fact when all this power and influence were removed by his death in 1896, and their silence for four years thereafter, much more their execution of the contract of 1896, in performance of that of 1889, irrevocably ratified the settlement. The law gives one who is induced by fraud to make a contract the option to rescind it. But it imposes upon him the duty to exercise that option with all convenient speed after his discovery of the fraud. He may not speculate upon it. He may not lie in wait until time and change make his interest plain, and then make his choice. Silence, delay, acquiescence, or the retention of the fruits of the agreement for any considerable length of time after the discovery of the fraud, constitutes a complete and irrevocable ratification of the transaction. Rugan v. Sabin, 3 C. C. A. 578, 580, 53 Fed. 415, 418; Kinne v. Webb, 4 C. C. A. 170, 174, 54 Fed. 34, 38; Wheeler v. McNeil, 41 C. C. A. 604, 607, 608, 101 Fed. 685, 688, 689.

The restoration of the status quo as far as possible, and hence the return of the fruits of the contract, if that may be done, is indispensable to its rescission or repudiation. One may not retain the benefits and renounce the burdens of his agreement. Nor can he retain the fruits of a bad bargain and maintain a suit for enough more to make it a good one. The four children of Daniel still keep the 177 shares of the stock of the Burnes Estate, which were worth $115,000 in 1889, and which are now, with the 375 shares returned to the corporation and retired, worth $1,100,000, and ask a court of equity to sweeten their trade by transferring to them other shares worth many hundred thousand dollars more. They purchased the 177 shares, now worth $1,100,000, with property worth no more than $275,000 in 1889. Their retention of the fruits of their bargain through all these years is alike fatal to a claim for the rescission of their agreement and to their prayer to the chancellor to make for them a better bargain. McLean v. Clapp, 141 U. S. 429, 12 Sup. Ct. 29, 35 L. Ed. 804; The Ernest M. Munn, 13 C. C. A. 510, 511, 66 Fed. 356, 357; Grymes v. Sanders, 93 U. S. 55, 62, 23 L. Ed. 798; Breyfogle v. Walsh, 80 Fed. 172, 176, 177, 25 C. C. A. 357, 362.

For obvious reasons of public policy, compromises of conflicting claims by family settlements are encouraged by the courts, and they may not be avoided or disregarded for mere inadequacy of consideration, or except upon clear and convincing proof of grave fraud or mistake. Stapilton v. Stapilton, 1 Atk. 2, 2 White & Tudor's Lead. Cas. in Equity, pt. 2, p. 920; Supreme Assembly v. Campbell, 17 R. I. 402, 22 Atl. 307, 13 L. R. A. 601; In re Palethorp's Estate, 168 Pa. 101, 31 Atl. 885.

A court of equity may condition its grant of relief to those who seek its aid by the requirement that they shall do equity to their opponents, although the latter have been barred by limitation or by laches from successfully seeking that equity by an independent suit. But it may not require them to do inequity, and it must be satisfied that its condition is just and equitable before it imposes it. All the active participants on the part of the descendants of James in the settlement of 1889 died before the claim of the children of Daniel to repudiate it was made. Marvelous changes of conditions and values have occurred since that date. A share of stock in the Burnes Estate, which was worth $650 in 1889, now has a value of $4,000. Before the contract of 1889 the four children of Daniel were entitled to no stock in the Burnes Estate, and without it they would probably never have secured any. For a possible $275,000 they have secured stock now worth more than $1,000,000. Rescind this settlement, restore their stock to the corporation, and grant them their $275,000 and interest, and they lose far more than they gain. Hence they do not seek this relief. But they may not at the same time approbate and reprobate. The contract must either be affirmed or rescinded. Affirm it, and they are conclusively estopped from claiming a larger share in the corporation than they agreed to accept for their interest in the property. Turn it as we may, view it from whatever point, there is no foundation at law, and no equity, in the claim of the four children of Daniel that to the 177 shares which they bought, and which they still retain, hundreds of thousands of dollars should be added, either by a redistribution of all the stock of the corporation, or by their retention of the 300 shares which they wrongfully took from the Burnes Estate; and there was no error in the refusal of the Circuit Court to grant them any relief of this nature.

The decree below is sustained by the evidence, it is in accordance with established rules and principles of equity, and it must be affirmed. It is so ordered.