### CHANNON v. LUDLAM.

(Circuit Court of Appeals, Seventh Circuit. January 12, 1927. Rehearing Denied February 3, 1927.)

No. 3699.

1. **Guardian and ward** ⊜⇒142—Ward's release under advice of attorneys held not executed, when she was deceived, defrauded, or under duress.

Under evidence showing that release by ward to guardian was executed while she was in possession of all facts and acting under advice of attorneys, release will not be held to have been executed when ward was deceived or defrauded, or under duress.

2. **Guardian and ward** ⊜⇒142—Ward's release, unsupported by consideration, is void.

Ward's release to former guardian, unsupported by legal consideration, is void.

3. **Guardian and ward** ⊜⇒142—Guardian's performance of legal duty is not consideration supporting release.

The performance of legal duty by guardian is not sufficient legal consideration to support a release by ward.

4. **Guardian and ward** ⊜⇒142—Settlement of controversy held sufficient to support release to former guardian.

Settlement of controversy between former guardian and ward held valid consideration for release executed by ward, pursuant to negotiations in respect thereto.

Page, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Illinois.

Suit by Mabel A. Ludlam against James H. Channon. Decree for plaintiff, and defendant appeals; Leigh Arey Channon, as executrix of his estate, being substituted for appellant after his death. Reversed, with directions.

Edwin H. Cassels, of Chicago, Ill., for appellant.

Louis M. Greeley, of Chicago, Ill., for appellee.

Before ALSCHULER, EVANS, and PAGE, Circuit Judges.

EVAN A. EVANS, Circuit Judge. This appeal is from a decree awarding appellee the sum of $235,076.16 against James H. Channon, her former guardian. Appellee brought the suit against James Channon, her brother-in-law and former guardian of her estate, and also against Leigh Arey Channon, her half-sister and a former guardian of her person, for an accounting. The litigation was most protracted, but finally resulted in the aforementioned decree against James Channon. The bill was dismissed as to Leigh Arey Channon. Pending this appeal, James Channon died, and Leigh Arey Channon, his widow, as executrix of the estate, was substituted, and is the present appellant.

The defense relied on is a settlement accompanied by a release executed by appellee, and the issue on this appeal is narrowed to a question of the validity of the release. There were three settlements made, and three different releases executed by appellee.

Mention of the first two is made only as they throw light on the third or final settlement, the real defense in this suit.

The first release was made a few days after appellee became 18 years of age. The proceedings in the probate court disclosed no irregularity, either in investments or accounting, on the part of the guardian. Channon filed his financial report as guardian, together with a release and receipt in full from his ward. As a matter of fact, however, the property was not actually turned over to the ward, but all of it was retained by Channon. Appellee had lived for 10 years in the home of her sister-in-law and her guardian, and was only 18 years of age, and in no equal position to deal with her guardian. It may be added that appellant does not rely upon this release. Certainly the court properly held it for naught.

Appellee lived with the Channons for some time thereafter, but about 3 years later entered school at Bryn Mawr. Between the two dates, when appellee was about 21 years of age, Channon bought a home on Dearborn street, paying some $40,000 for it. The deed ran to his wife. Payment therefor was made from appellee's funds. Channon made substantial improvements thereon, to the knowledge of appellee, and furnished it elaborately, all from appellee's estate. While at Bryn Mawr, appellee became engaged to and in April, 1906, married, Mr. Ludlam. A few days before her marriage, Channon went to Philadelphia, where he was to attend the wedding, and made a settlement with appellee. An attorney, Mr. Wilkinson, who was familiar with the affairs of the estate of her father, advised her.

The details of this settlement need not be recited. Channon did not turn over all of the property he had received, and did not account to his ward as an honest, faithful trustee or guardian should have done. The chief item omitted (later in difference) was the Chicago home, the cash expended on its improvements, and the cash that went into its furnishings, some $70,000 in all. A small item (a check for $1,350) occasioned much subsequent dispute. Appellee said Channon was to give her this check, and she receipted for it on this promise. Channon took various inconsistent positions in respect to it, and it was finally omitted in the third settlement. About 15 months later, a third settlement was made, and a third release executed by appellee. · The refusal of the court to sustain its validity constitutes appellant's chief reliance for reversal of the decree.·

In making this settlement, both parties employed attorneys, appellee being represented by two reputable counsel, one residing in Philadelphia, and one in Chicago. The exact amount of Channon's liability was first ascertained by reference to the records of the probate court, where the inventory and reports of Channon as guardian were on file. The record of payments made by Channon was in appellee's possession and the balance was readily ascertained. A demand for its payment followed. For the purpose of this opinion, it can be and is assumed that appellee is correct in saying that the release of 1902 was a paper release merely, and did not change the relation of the parties, or release Channon from any liability that arose by reason of the guardianship; that the second release was tainted with fraud, and made without Channon's filing a full and detailed statement which was forthcoming from one in his position. It may likewise be assumed that appellee's story in respect to the house on Dearborn street is true. In other words, appellee never gave the Dearborn street house to her sister, and never sanctioned the investment of her money in its improvement or furnishings. With these concessions made, appellee is still confronted by her third release, that of July, 1907.

[1] Appellee insists such release was fraudulently secured, and was executed without valid or legal consideration. That the release was made when the parties were dealing at arm's length, when hostility had replaced the in loco parentis status that once existed, when both parties were of full age, and both were represented by counsel, conclusively appears from the record. It is established by documentary evidence, parts of which are here reproduced. Appellee's letters disclose her maturity and her intelligence, as well as the nature of the advice she received.

She consulted her attorney, Mr. Reed, of Chicago, in July, 1906, having previously consulted counsel in Philadelphia. Mr. Reed promptly investigated the records of the probate court, and ascertained the gross amount of Channon's liability. He then "checked off" the amount turned over, and in January, 1907, made demand on Channon for the difference, roughly stated as $100,-000. On March 2d, appellee wrote to Reed:

"My Dear Mr. Reed: Mr. Wilkinson has just sent me your wire. Thirty-five to forty thousand seems a small matter when a hundred thousand and over is due me. Cannot understand how the deed of the house alone will recompense me in any way. They would expect to live there, and as far as giving Mrs.

Channon the house in any way I consider that a very bad proposition, I wish the house without any (illegible word) whatsoever.

"I wish you would write me just what the figures are in your bill. Mr. Wilkinson seems to consider the house would repay sufficiently. I cannot see it in that light. Whatever investments Mr. C. has made in his name were made with my money, as I presume you are aware. * * * There must be some of my money safely hidden somewhere, and I believe that he should be made to turn it over. Possibly it may be in his wife's name, but, even if so, I believe they will turn it over, rather than face the notoriety. * * * The house would have to either be sold or rented. There is no reason why I should not have the benefit of the income on the thirty or forty thousand, which is very little in lieu of what has been taken from me."

On March 11, Reed replied at great length:

"Dear Madam: I have your favor. You are, I think, under some misapprehensions. The offer made was not that the house be conveyed to you for your life, but that it be conveyed subject to a life estate on the part of Mrs. Channon, which means that the house would belong to you, or your heirs, upon her death. You are also under misapprehension in supposing that the money invested in the house is not included in Mr. Channon's shortage. As a matter of fact, these payments are a part of his shortage, and he can undoubtedly reduce this shortage by showing the amounts paid for the house improvements and furniture with your approval. There is no doubt that you did approve of the payment for the house. To what extent you subsequently approved the specific disbursements for furniture and improvements I do not know. If you got back the house, you would get the value of these payments for the house itself and permanent improvements. You wouldn't get the furniture.

"Let me be clear on this question. Channon's shortage is, roughly speaking, $100,-000. This is the difference between the values of the securities which he received, as agent after his discharge as guardian, and the securities which he turned over or accounted for to you. This does not include the income, made up of interest and dividends arising from the securities. In accounting under this shortage, Mr. Channon could undoubtedly show payments in connection with the house and say they were $60,-000; then, if these payments were made with your approval, the shortage would be only $40,000, and I have no question but

that some of this $40,000 can be accounted for by the turning over of some of the mortgages. Therefore the considerations which move me to what I am about to say are the lessening of the claim against Channon by the payments of the house, his impecunious condition, and the delay, expense, and uncertainties of litigation. I have, therefore, just called up Mr. Wolseley, his attorney, and told him that you not only rejected the offer of the conveyance of the house subject to a life estate, but that you did not think the house without any conditions was sufficient. I told him further that, if they would convey the house without any conditions or reservations, free from all liens and incumbrances, and would account for the $1,350 missing check, either by showing that you received it, or, if you did not, by paying the amount, I would earnestly recommend that you accept this in settlement. * * * I told him that we would allow a reasonable time, say six months, for them to turn over possession. * * *

"I do most earnestly advise you to accept this proposition. If it can be carried out, it will get you back almost 50 per cent. of the amount which you claim without delay and without additional trouble. The litigation, if embarked upon, will be a long, disagreeable, and expensive one. While I believe you are right, and this man does owe you a considerable sum of money, it is impossible to fix the amount until everything has been threshed over. I think it can be said that I am perfectly disinterested in giving you this advice, because, if the litigation is begun and continued, it would be a matter of considerable financial importance to me. * * * I did not feel like recommending that you take the proposition submitted, viz. the conveyance of the house with a life estate reserved to Mrs. Channon, although I hesitated much before taking that position on that offer. I do think, however, that an absolute conveyance of the house would be a good settlement. Kindly let me know your view.

"Yours sincerely, Frank F. Reed."

On July 5th, after various letters and telegrams had passed between them, appellee wrote her attorney:

"Dear Sir: This is to authorize you, if in your judgment the settlement is a satisfactory one for me to make, to close up the matter of the claim against my former guardian, Mr. James H. Channon. I will agree to accept a deed of conveyance, clear of incumbrance, from himself and wife, of the Dearborn avenue property. I shall be satisfied then to give them a lease of the premises for

a period of one year (May 1, 1907) at a rental commensurate with the value of the property and to receipt for one year's rent in advance without receiving any money therefor. All proper releases prepared to carry out the settlement will be duly executed by me.

"Unless this offer is accepted at once, I hope you will press matters vigorously from every standpoint. I yield on the claim of the $1,350 check in order to get a speedy settlement. Of course you will see that I get the piano and books.

"Very truly yours,

"Mabel Arey Ludlam."

Mrs. Channon, it seems, then appealed directly to appellee, but to no avail. Appellee wrote Reed on July 22d as follows:

"My Dear Mr. Reed: Mrs. Channon wrote me, asking me not to carry out my suit and begging me to stop all litigation. I replied that I had given my lawyers instructions and that I would hold to my directions to you. I dwelt upon the chance they had of settlement. They do not seem to realize that they can avoid a litigation by complying with my original request and handing over the house.

"I will not frustrate, but as a very last resort—certainly if they have nothing—a suit would only involve unnecessary expense. I am convinced that they will settle with a little pressure and that is my ultimate aim.

"Very truly, Mabel Arey Ludlam.

"P. S. I would suggest that perhaps they are holding back to gain time in which to accomplish some scheme."

She also wired Channon as follows:

"Have wired Reed settlement must be made with him, and closed before his vacation begins, or proceedings be instituted. This is absolutely imperative and irrevocable.

"Mabel A. Ludlam."

Channon then appealed to her, and received the following wire:

"Suit can be avoided by speedy settlement. Reed has instructions from me for best proposition. All business must be done with my lawyer."

The settlement followed. Mrs. Channon deeded the Dearborn street property to appellee, and appellee's duly executed release was delivered to Channon.

It is too plain for argument, from the foregoing, that the third release was executed freely and voluntarily. Appellee was in possession of all of the facts upon which she could intelligently act, and was carefully and fully advised by her lawyers. It is impossible on this record to sustain the contention that appellee was deceived, or defrauded, or that she was under duress when she executed this release.

[2] The only remaining ground for setting aside the release is the alleged failure of consideration. Citations are hardly necessary to support the legal propositions so well established as those here involved; for it is elementary that a release unsupported by a legal consideration is void.

[3] The performance of a legal duty is not a sufficient legal consideration to support a release. Robinson v. Jewett, 116 N. Y. 40, 22 N. E. 224; Fink v. Smith, 170 Pa. 124, 32 A. 566, 50 Am. St. Rep. 750; Morgan v. Hodges, 89 Mich. 404, 50 N. W. 876, 15 L. R. A. 438. But appellant's position is that a settlement of a doubtful or disputed claim is a sufficient consideration to sustain a release. Kiefer Oil & Gas Co. v. McDougal (C. C. A.) 229 F. 933, 938, Ann. Cas. 1916D, 343; 5 Ruling Case Law, 882, 3. And this is true as between a guardian and a ward, or any trustee and a cestui que trust. Burnes v. Burnes (C. C. A.) 137 F. 781, 801.

[4] That Channon's claim that the Dearborn street residence belonged to his wife, and the improvements were made with appellee's knowledge and approval, presented such a controversy as permitted its settlement to be used as a valid consideration for the release, we entertain no doubt. There is no question but that appellee could have made a valid gift to her half-sister, notwithstanding Channon was her guardian. Towson v. Moore, 173 U. S. 17, 19 S. Ct. 332, 43 L. Ed. 597. She could have made a gift to her guardian. Ludwig v. Bressler (C. C. A.) 253 F. 8, 11. Whether she made such a gift, and Channon was able to produce the necessary proof to establish such a gift, were far more doubtful issues of fact than the question of law. Channon and his wife, besides several witnesses, testified to the gift, and plaintiff denied it. If our question were one of fact, we might well accept appellee's testimony. But our inquiry is merely to ascertain whether there existed a bona fide controversy, the settlement of which afforded a legal consideration for the release. And this inquiry must be answered in the affirmative.

Then there was the second release, upon which Channon relied. While not so strongly supported in the way of evidence, it confronted appellee, who was required to set it aside before she could realize on her various claims. Grant that her chances of setting this release aside were bright; yet its existence, and Channon's reliance upon it, made the whole matter one for settlement, which, when fairly and intelligently made, was sup-

ported by a sufficient consideration to conclude the parties to it.

The question presented is not one involving the liability of an ex-guardian to his ex-ward. Rather is it one involving the right of parties of full age—dealing at arm's length —to settle their disputes out of court.

The decree is reversed, with directions to dismiss the bill.

PAGE, Circuit Judge (dissenting). The reasons which make it seem necessary for me to dissent are, for the most part, based upon disclosures of the prevailing opinion.

When plaintiff went to live, as an orphan, with her half-sister, she had an estate of over a quarter million dollars, was 8 years old, and her half-sister's husband, Channon, became and continued as her guardian until she was 18 years old. He got his release then, as guardian, on the strength of a long release in full from her, made after she had checked over a list of securities belonging to her in Channon's safety box. She did not examine the securities and it does not appear that she knew more than the ordinary 18 year old girl about such things. Nothing she receipted for was then given to her, and Channon should not have taken such a receipt. It constituted no settlement.

Before plaintiff was 19 years old, her guardian, who by his own act had passed from the position of guardian to that of agent, converted some $70,000 of her property to his own use. When she was 22 years old, Channon turned over some of her property at Philadelphia the day before her marriage. Her attorney refused to permit her to sign the receipt presented, but permitted her to sign another. The next day, Channon, by telling her it was a duplicate of the receipt already signed, procured her signature to the very receipt which she had, the day before, refused to sign. More might be said, but that stated in the prevailing opinion is sufficient: "Channon * * * did not account to his ward as an honest, faithful trustee or guardian should have done."

Why the prevailing opinion raises a doubt as to the possibility of setting aside such a false, fraudulent, and pretended settlement is not easily understood. That was no settlement. The settlement in question was procured when the girl was 24 years old, or less, and there seems to be no question but that it, also, was fraudulent. The decree finding it fraudulent has the support of the findings of the master, and those findings are approved by the prevailing opinion. But it is said this 24 year old girl had a mind, and

a lawyer, was fully advised, and should be bound by the settlement.

She was not fully informed, nor informed at all, by her agent. Letters between plaintiff and her lawyer are quoted in the opinion. Her lawyer's letter shows that Channon's shortage was over $100,000 and advises settlement. Why? Because: (a) "It will get you back almost 50 per cent. of the amount which you claim;" (b) "litigation, if embarked upon, will be a long, disagreeable, and expensive one;" (c) "it is impossible to fix the amount until everything has been threshed over." While those are the words used by the lawyer, they were the conditions created by the fraudulent misconduct of Channon, and they were the obstacles put in the way of the young woman, by her guardian agent brother-in-law, who, since her eighth year, had been in the position of a father.

What did Channon do to earn the right to have plaintiff bound by that settlement? Nothing. The only information the attorney had on which to base settlement was information afforded by the guardian's report, made four or five years before. Her lawyer told plaintiff Channon was impecunious. No facts are disclosed showing that to be true, and the vigor with which this case has been and is being fought rather indicates otherwise.

Channon made no report of his stewardship, as agent of plaintiff, and helped in no way to enable her to determine her rights. That plaintiff's attorney was able to get some information from an old report in the probate court was merely a fortuitous circumstance. That the court in this case would find it to be substantially correct plaintiff could, at the time of the settlement, not know. The information had by Channon concerning her estate belonged to her, and he could only acquit himself, as an honest, faithful agent, by a full and truthful disclosure. Instead of making such disclosures, Channon compelled plaintiff's attorney to make the statements quoted above, which could only confuse, frighten, and discourage plaintiff.

There is an old rule of law that one may not profit by his own wrong; but, if this opinion is to hold, it now becomes the law that, if an agent takes the property of a young girl, and violates every duty as such agent, and carries the agency along until his ward and principal has accumulated years, though they be not many, he may, out of such wrongdoing, build up a consideration for a settlement, and not only gain immunity, but a substantial profit, from such wrongdoing.